## NORTH CAROLINA v. TEMPLE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NORTH CAROLINA.

No. 392.   Argued January 22, 23, 1890. — Decided March 3, 1890.

This suit was commenced against the State of North Carolina and against the auditor of that State, as defendants, to compel the levying of a special tax for the benefit of certain holders of its bonds; *Held*,

(1) That the suit against the auditor was, under the circumstances, virtually a suit against the State;

(2) That, on the authority of *Hans* v. *Louisiana, ante,* 1, the suit could not be maintained against the State.

THIS suit was commenced in the Circuit Court of the United States for the Eastern District of North Carolina by bill in equity filed by Alfred H. Temple, a citizen of North Carolina, on behalf of himself and other bondholders in like interest, against the State of North Carolina and William P. Roberts, the auditor of said state.   The object of the bill was to compel said state and its officials, including the auditor, to execute and carry into effect a certain statute of the State, passed January 29, 1869, which provided for raising taxes to pay the interest on certain bonds of the state, called "special tax bonds of the state of North Carolina," Laws of 1868–1869, 67, c. 21, issued under the provisions of said act, and held by the plaintiff and others.   In other words, it was a suit, in the nature of a bill for a specific performance of a contract, brought to compel the State of North Carolina to raise a tax for the payment of the arrears of interest due on the state bonds held by the plaintiff and others.

The act referred to authorized a subscription on the part of the State of $4,000,000 of the capital stock of The Wilmington, Charlotte and Rutherford Railroad Company, and the issue of state bonds for the payment thereof, payable thirty years after date, with interest at six per cent per annum, payable semi-annually, to be represented by coupons.   The subscription was made and 3000 of the bonds, for $1000 each,

were issued, of which the bonds of the plaintiff, which constitute the ground of the present suit, are a part.

By the sixth section of the act it was provided as follows:

"Sec. 6. For the purpose of providing for the payment of the interest upon the bonds hereby authorized and the principal at its maturity, an annual tax of one-eighth of one per cent is hereby imposed upon all the taxable property of the state, which shall be levied, collected, and paid into the state treasury as other public taxes, and the surplus, after paying the interest, shall be invested in securities of the United States or other safe securities and kept as a sinking fund for the payment of the principal money at maturity."

The bill alleged that the plaintiff was the *bona fide* holder of ten of said bonds, (giving their numbers,) and that the overdue coupons attached thereto, unpaid, amounted to $9900; that in the year 1869 the collection of the special tax was duly made, and a portion of the coupons was paid; but that in the month of January, 1870, and while large amounts of money arising from the collection of the special tax aforesaid remained in the hands of the state treasurer, applicable to the payment of said coupons, the State of North Carolina, in violation of the Constitution of the United States, did by legislative resolution direct the appropriation of the said moneys then in the hands of the treasurer to other purposes; and that, after all of said 3000 bonds had been issued according to law, the State of North Carolina undertook to impair the obligation of the contract, and to that end, on the 20th of January, 1870, formally enacted the following resolution:

"*Resolved*, That the treasurer be instructed and directed not to pay any more interest on the special tax bonds until authorized and directed so to do by this general assembly."

That to the same end, upon the 8th of March, 1870, Laws of 1869–1870, 119, c. 71, the State also passed an act declaring as follows:

"Section 1. *The General Assembly of North Carolina do enact*, That all acts passed at the last session of this legislature making appropriations to railroad companies be, and the same are hereby, repealed; that all bonds of the State which

have been issued under the said acts now in the hands of any president or other officer of the corporation be immediately returned to the treasurer.

"Sec. 2. The moneys in the state treasury which were levied and collected under the provisions of the acts mentioned in section one of this act are hereby appropriated to the use of the state government, and shall be credited to the counties of the State upon the tax to be assessed for the year one thousand eight hundred and seventy, in proportion to the amounts collected from them, respectively."

That with the same view, upon the 23d of November, 1874, Laws of 1874–1875, 2, c. 2, the general assembly passed an act containing the following provisions:

"Sec. 2. That the treasurer shall not pay or discharge any claim for interest upon any portion of the bonded debt of this State, except as hereinafter provided for by law.

"Sec. 3. That the auditor shall not audit or recognize any claim for principal or interest upon any portion of the bonded debt of this State heretofore made or pretended to be made by authority of this State, except as hereafter provided for by law.

"Sec. 4. That any money in or which may be paid into the treasury on account of special taxes heretofore levied for the payment of the interest on bonds or pretended bonds of this state is hereby transferred and appropriated to the general fund."

That in like connection, on the third day of November, 1880, the following constitutional amendment was adopted by the State:.

"Nor shall the general assembly assume or pay or authorize the collection of any tax to pay, either directly or indirectly, expressed or implied, any debt or bond incurred or issued by authority of the convention of the year 1868, or any debt or bond incurred or issued by the legislature of the year 1868, at its special session of 1868, and at its regular session of 1868 and 1869 and 1870, except the bonds issued to fund the interest of the public debt, unless the purposing to pay the same shall have been submitted to the people or by them ratified, by the vote

of a majority of qualified voters of the State at a regular election held for that purpose." '

The bill further alleged that since the 20th day of January, 1870, none of the coupons belonging to said bonds, which had fallen due, had been paid, though payment of the same had been duly demanded; that the above-mentioned special taxes had not been collected; that none of the contracts performable under said act of January 29, 1869, had been performed, and that the government of the State had constantly enforced upon its officials compliance with the subsequent nullifying enactments above set forth.

The bill then averred that by virtue of the provisions of the constitution of North Carolina and of the said act of the general assembly of January, 1869, and of the issue of bonds thereunder, a contract was constituted between the State and the holders of said bonds, which was in the same connection a contract executed by said State, by the levying of the tax and the committing of its collection to state taxing officials and the direction to other state officials for the regular payment of the coupons and the investment of the surplus arising from the taxes in good securities, to be kept as a sinking fund for the payment of the principal.

It further averred that the statutes of North Carolina, hereinbefore set forth, which attempted to impair the contract in question, had not taken legal effect for the reason that the said laws were violations of the Constitution of the United States, both in its contract clause and in the Fourteenth Amendment thereto.

After showing the manner of levying taxes in North Carolina, and several matters as grounds of equitable jurisdiction, the bill prayed, amongst other things, that the respondents be perpetually enjoined from obstructing or impeding the collection and payment of the special tax in question; and that the respondent, the State of North Carolina, its executive agents and officials, and William P. Roberts, the auditor of the state, be decreed to execute the said act of January 29, 1869, and to cause the proper statutory lists to be sent to the boards of county commissioners containing provisions for the special tax above described; and for general relief.

A subpœna was issued, and served upon the governor, attorney general, and auditor of the state. The attorney general, on behalf of the State, filed a motion to dismiss the bill as against the State, alleging that the State did not consent to be a party defendant. The auditor filed a demurrer to the bill, on the ground that by the showing of the bill itself he had no personal interest in the matters complained of, and that the bill was against him in his official capacity only, and required him as an officer of the state to act contrary to the commands of the legislature of the state, in raising money by taxation.

On the main question, the circuit judge and the district judge, who held the court, were opposed in opinion, the opinion of the former being in favor of the complainant; in pursuance of which the following decree was made, to wit:

"This cause coming on to be heard, the parties named as defendants thereto, by their counsel, announce to the court that they will not farther plead or answer thereto, but will abide, the one by its motion and the other by his demurrer; that they also waive the taking of any account in regard to the coupons alleged by the plaintiff to be by him held.

"Whereupon it is declared by the court that the said State of North Carolina is indebted to the said Alfred H. Temple for coupons held by him as in his bill alleged, and now by him deposited with the clerk of this court to the amount of nine thousand nine hundred dollars, principal money, together with five thousand five hundred and forty-five dollars for interest due thereon up to the present term of this court, and also for interest upon said principal money until paid, which amounts the said State is hereby adjudged and decreed to pay to the said Temple.

"And it is further ordered that the said William P. Roberts, as auditor of the State of North Carolina, proceed in due course of his office to execute the provisions of the act passed by said State on the 29th of January, 1869, entitled 'An act to amend the charter of the Wilmington, Charlotte and Rutherford Railroad Company, to provide for the completion of said road, and to secure for the State a representation in this

company,' so far as such execution may be necessary to satisfy this decree."

The point on which the judges differed was stated as follows:

"It appearing to the court that the case made in the record against Roberts as auditor, etc., was merely incidental to that against the State of North Carolina, it occurred as a question —

"Whether such suit could be maintained in this court against said State by the complainant, he being one of the citizens thereof.

"Upon which question the opinions of the judges were opposed, His Honor Judge Bond being of opinion that it was so maintainable, and His Honor Judge Seymour being of opinion to the contrary.

"Whereupon the above question was, during the same term stated as above, under the direction of the judges, and certified, and such certificate ordered to be entered of record."

*Mr. R. H. Battle* and *Mr. John W. Graham* for appellants. *Mr. T. F. Davidson*, Attorney General of the State of North Carolina, and *Mr. Thomas Ruffin* were with them on the brief.

*Mr. S. F. Phillips* for appellee. It is not practicable to give more than the points of Mr. Phillips's argument, with the citations.

I. By the common law the English Crown is obliged, at the instance of a subject or an alien friend, to refer to the regular courts for hearing and determination whatever issues upon rights of property may have been raised on behalf of such parties by its own act, in case these issues would have been so referable if raised by act of a private person.

Such instance is by means of a petition of right by which the suppliant sues to the Crown for such an endorsement thereupon as will allow his case a hearing and determination in the regular courts of justice, in the same manner as (at first in fact; and so long as original writs were used, in

theory) he would have sued to him for process allowing like hearing and determination against a private person, supposing his cause of action had been against the latter, such favorable endorsement being at the same time as much *ex debito justitiœ* in the one case as the original writ would have been in the other.

The practical operation of that proceeding is such that if the coupons now in suit had been taken from bonds issued in 1869 by the British government, and payment thereof had been refused, the Crown would be obliged by the common law, upon application of this citizen of North Carolina, to allow to him the right of a suit in its regular courts against itself to enforce his claim. If the common law be otherwise in America the general belief that our citizens are in matters of right more upon an equality with their own governments than English subjects (or indeed than such citizens themselves) are with the English Crown may require revision. *The Queen* v. *Von Frantzin,* 2 DeG. & J. 126; *Windsor & Annapolis Railway* v. *The Queen,* 11 App. Cas. 607; *The Queen* v. *Doutre,* 9 App. Cas. 745; *Thomas* v. *The Queen,* L. R. 10 Q. B. 31; *Tobin* v. *The Queen,* 16 C. B. (N. S.) 310; *Feather* v. *The Queen,* 6 B. & S. 257; *Canterbury* v. *The Attorney General,* 1 Phillips, Ch. 306; *Monckton* v. *The Attorney General,* 2 Macn. & Gord. 402; *De Bode* v. *The Queen,* 3 H. L. Cas. 449; *Frith* v. *The Queen,* L. R. 7 Ex. 365; *Rustomjee* v. *The Queen,* 2 Q. B. D. 69; *Kirk* v. *The Queen,* L. R. 14 Eq. 558. See, also, Chitty's Prerogatives of the Crown, 345; 2 Inst. 269; 3 Inst. 31; 4 Inst. 21; 3 Bl. Com. 49; Bowyer Const. Law Eng. 141; Broom Const. Law, 509; Daniell Ch. Pl. and Pr. ed. 1846, c. 84, § 2; Manning, Exch. Pr. 84, ed. 1827; *Banker's Case,* 14 State Trials, 1; 2 Stubbs' Const. Hist. 555, 557; *Petition of Right,* 3 State Trials, 60 to 230; *Ashby* v. *White,* 14 State Trials, 695; *Smith* v. *Upton,* 6 M. & G. 251; Mirror of Justices, 4, 10, 225.

II. The forms by which creditors of the Crown are referred to courts of justice correspond substantially with those of the like reference in cases betwixt subjects.

Petition of Right is sometimes spoken of as if it were a form of proceeding that in point of principle is entirely unlike

those ordinarily in use by litigants in England; *ex. gr.;* that by original writ. It is submitted that this assumption is not correct.

In the same way application to the king for justice against himself is a "petition," a short endorsement upon which opens the courts to the plaintiff for the case to which that endorsement refers, substantially in the same manner as is done in ordinary cases, either by the king's original writ in answer to an oral application or "petition" or by a bill and subpœna.

That the application, or supplication, by petition of right is made to the king in person, whereas ordinary applications for original process are to his subordinates (the allowance in all cases being equally *ex debito justitiæ*) is explained by the circumstance that the class of cases in which he himself was to be defendant has never been so large as to prevent his personal attention to applications for original process in that. So that the issue of such process in that class is seen to be a survival from the time when the king issued all process, and not as sometimes, and perhaps without much consideration suggested, an abnormal provision of English law. Thus it is seen that the proceeding by petition of right is, even in point of form, analogous to the ordinary methods of beginning suits, and that it is in his character as the original Fountain of Justice, and by way of mere survival from his former vast duties, in that character and of the same sort, that the king acts therein.

III. By passing a law which impairs the obligation of a contract of its own, or by depriving the other party of his property therein without due process, a State becomes subject to the judicial power of the United States for whatever relief judicial power ordinarily exerts to establish and give effect to violated contracts.

IV. The act of 1875, c. 137, investing circuit courts with jurisdiction over "all suits of a civil nature at common law, or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars and arising under the Constitution or laws of the United States" has

thereby conferred upon these courts judicial power to enforce the obligation of contracts of a State of that value when impaired by its own laws.

V. Inasmuch as laws passed by the State of North Carolina, Resolution of Jan. 20, 1870; Act of 1870, c. 71, March 8; Act of 1874, c. 2, Nov. 23, and a constitutional amendment adopted in 1880; Const. art. 1, sec. 6;. impair obligations of that State created in 1869, by issuing the coupons now in suit, and deprive the holders of such coupons of property without due process of law, the opinion of the presiding judge below was correct.

*Mr. Edward L. Andrews* also argued for appellee.

MR. JUSTICE BRADLEY, after stating the case as above, delivered the opinion of the court.

We think it perfectly clear that the suit against the auditor in this case was virtually a suit against the State of North Carolina. In this regard it comes within the principle of the cases of *Louisiana* v. *Jumel*, 107 U. S. 711; *Cunningham* v. *Macon & Brunswick · Railroad · Co.*, 109 U. S. 446; *Hagood* v. *Southern*, 117 U. S. 52; and *In re Ayers*, 123 U. S. ·443. We do not think it necessary to consider that question anew.

The other point, the suability of the State, is settled by the decision just rendered in *Hans* v. *The State of Louisiana*, *ante*, 1.

To the question on which the judges of the Circuit Court were opposed in opinion, our answer is in the negative, namely, that the suit could not be maintained in the Circuit Court against the State of North Carolina by the plaintiff, a citizen thereof.

The decree of the Circuit Court is

*Reversed and the cause remanded with instructions to dis- · miss the bill of complaint.*

MR. JUSTICE HARLAN dissenting:

·   I dissent from so much of the judgment in this case as holds that this suit cannot be maintained against the auditor of

the State of North Carolina. The legislation of which complaint is here made impaired the obligation of the State's contract, and was therefore unconstitutional and void. It did not, in law, affect the existence or operation of the previous statutes out of which the contract in question arose. So that the court was at liberty to compel the officer of the State to perform the duties which the statutes, constituting the contract, imposed upon him. A suit against him for such a purpose is not, in my judgment, one against the State. It is a suit to compel the performance of ministerial duties, from the performance of which the state's officer was not, and could not be, relieved by unconstitutional and void legislative enactments.