STATE OF TENNESSEE, suing by WOLF-ENBARGER, Dist. Atty. Gen., ex rel ATCHLEY et al. v. TAYLOR, United States District Judge.

No. 10706.

Circuit Court of Appeals
Sixth Circuit.

July 7, 1948.

James B. Wright, of Knoxville, Tenn., and George G. Allen, of Sevierville, Tenn., for petitioner.

No attorney for respondent.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The State of Tennessee, suing by the District Attorney General for its Second Judicial Circuit on relation of eleven of its citizens, has petitioned this court for a show cause order to be directed to the Honorable George C. Taylor, United States District Judge for the Eastern District of Tennessee, Northern Division at Knoxville. The State avers that the appeal which it has taken from orders and decrees of the district court furnishes an inadequate and incomplete remedy; and that the issuance of a writ of mandamus in aid of the appeal is necessary to afford adequate protection to the State from the erroneous actions of the district judge. The petition which was filed on May 17, 1948, prays that the district judge be ordered to show cause why this court should not direct him to dissolve an injunction, issued by him on April 11, 1947, restraining the State of Tennessee and its relators from proceeding with a suit filed on March 27, 1947, in the Chancery Court for Sevier County, Tennessee, and to dismiss a reorganization proceeding filed in the United States District Court on March 20, 1947, by the Smoky Mountain Railroad.

■ Civil Procedure Rule 81(b), 28 U.S.C.A. following section 723c, abolished the writs of scire facias and mandamus, but provided that relief theretofore available by those writs may be obtained by appropriate action, or by appropriate motion under practice prescribed in the rules. Substantive rights are still governed by the principles formerly applied in mandamus cases. Youngblood v. United States, 6 Cir., 141 F.2d 912, 915. Rule 35 of the rules of this court [April 1, 1948, Edition] provides that the writ of mandamus will not be issued, but that on proper showing an order to show cause will be made. The rule provides further that a petitioner desiring a writ of mandamus shall file his petition therefor and showing in support thereof together with such brief or memorandum as he may desire. Notice need not be given, but a cost deposit is required and the clerk is directed to enter the application on his docket and informally submit the papers to the court. The petitioner has complied with this rule. The rule further provides that if the court is of opinion that the application justifies a hearing, a show cause order will be entered, returnable as promptly as the situation permits; but if the court is of contrary opinion, an order of denial will be made.

Inasmuch as the averments of the petition, if true in material detail, show that reversible error has been committed by the district judge, we deem it appropriate to write an opinion pointing to applicable law, so that the district judge may be fully advised as to our views when responding to the show cause order, and may point out to us any erroneous deduction which, in his judgment, we may have drawn. He will, of course, traverse any erroneous statement of fact made in the State's petition, which is sworn to by one of the relators.

■ Our narrative herein is based solely upon the factual allegations made by the petitioner which we, of course, are not adopting but are merely accepting as we must when acting upon its petition for a show cause order.

The Smoky Mountain Railroad obtained its charter from the State of Tennessee on August 12, 1926, for the purpose of operating a railroad from Knoxville to Sevierville, Tennessee, a distance of some twenty-nine miles. This corporation acquired the roadway, trackage and equipment of a railroad company which, as a live corporation.

had operated the railroad from 1909 to 1923, and subsequently from the latter year in receivership and reorganization down to the time of its acquisition by the Smoky Mountain Railroad.

In December 1937, the entire capital stock of the Smoky Mountain Railroad was purchased by Midwest Steel Corporation of Charleston, West Virginia, and its associates. In a report to the Interstate Commerce Commission for the year 1941, the Smoky Mountain Railroad declared that its 750 shares of stock were owned, as follows: Midwest Steel Corporation, 653 shares; Joe L. Silverstein, 96 shares; Max Kesselman, 1 share. The Silverstein and Kesselman families were closely linked in the ownership and control of the Midwest Steel Corporation, originally established by Alex P. Silverstein who began as a small salvage dealer in scrap iron. The corporation broadened its operations so as to deal in used rails and railway equipment, as well as in mining machinery, scrap metal and paper. Its principal activity for several years was the purchase and reconditioning for resale of rail equipment used in mines.

In an ad valorem tax report filed by the Smoky Mountain Railroad on March 30, 1938, with the Railroad and Public Utilities Commission of Tennessee, the Smoky Mountain Railroad stated: "This line was sold December 2, 1937, to a scrap iron dealer and it is worth no more than scrap value." In a similar report on April 7, 1942, filed with the Commission, the Railroad Company stated: "Stock of this line bought on Dec. 2, 1937, by second hand dealer for purpose of scrapping same. Permission to abandon was never obtained, worth no more than scrap value." Likewise, on June 1, 1945, the carrier stated in its report to the Commission: "Stock of this line bought Dec. 2, 1937, by a new group of stockholders who paid no more than scrap value." It was, therefore, perfectly obvious from the beginning that the purpose of the Midwest Steel Corporation and its associates in purchasing the stock of the Smoky Mountain Railroad was to abandon operation of the railroad and salvage its used rails, railway equipment and scrap metal. Indeed, shortly after acquisition of the Smoky Mountain Railroad's capital stock by the Midwest Steel Corporation and its associates, that railroad applied to the Interstate Commerce Commission for a certificate of convenience and necessity to abandon its operations. The Commission denied the application.

A second application for abandonment was filed by the Smoky Mountain Railroad with the Interstate Commerce Commission in December 1940. A hearing was had on this application on May 12, 1941. The Tennessee Valley Authority in September 1941 was permitted to intervene in the proceedings for the purpose of requesting that the case be reopened and a further hearing had. Following this intervention, Smoky Mountain Railroad requested on February 12, 1942, that it be permitted to withdraw its application for a certificate of convenience and necessity for the abandonment of the operation of the railroad.

Still persistent in its original purpose, the Smoky Mountain Railroad filed with the Interstate Commerce Commission, on March 14, 1947, a third application for abandonment of its entire line of railroad. This last application was duly docketed and is still pending before the Interstate Commerce Commission.

The Smoky Mountain Railroad suspended its operations on or about January 28, 1947, when one of the fills on the main line right-of-way was washed out and was not repaired. Connecting carriers and shippers were notified by Kesselman and Silverstein of the discontinuance of the operation of the railroad as a common carrier. Kesselman appeared personally before a meeting of shippers and told them that the operation of the railroad had been abandoned, and that the Interstate Commerce Commission would be asked to ratify such action; whereupon, the shippers enlisted the aid of the Railroad and Public Utilities Commission of Tennessee in an effort to bring about a restoration of the transportation service. The effort failed. The State District Attorney General was then requested to institute a quo warranto proceeding under section 9336 et seq. of the Tennessee Code in the Chancery Court for Sevier County, Tennessee, against the railroad and its owners, to procure a re-

ceivership and a forfeiture of the railroad company's charter. The District Attorney General agreed to comply with the shippers' request.

The petition alleged that "the owners and their counsel having in some way discovered that a bill for that purpose was being prepared for filing rushed into the United States District Court with their so-called reorganization bill on March 20, 1947 in order to circumvent the State of Tennessee from taking possession of the property and operating it under the authority of the quo warranto Act; and when the State filed its bill in the Chancery Court of Sevier County on March 27, 1947, the receiver appointed by the Chancellor and all other parties were enjoined from taking further steps in that proceeding."

The bill, filed by the State of Tennessee through its District Attorney General on the relation of eleven shippers, brought to the attention of the state-court Chancellor the cessation of operations by Smoky Mountain Railroad and its failure and refusal to repair the effects of the washout, which it was averred would cost between $500 and $2,000; and charged that the original purpose of the present owners of the Smoky Mountain Railroad was not to operate an efficient and serviceable railroad as a going concern, but was from the outset to effectuate "an abandonment as soon as possible and put the railroad out of business," using every opportunity to let its facilities fall into neglect so that the rails and other iron might be sold for salvage.

The bill in the state court charged that the Smoky Mountain Railroad and Silverstein and Kesselman, its principal stockholders and president and manager, respectively, who were also joined as defendants, had shown absolute disregard for the welfare of the general public and for the necessity of attempting to keep the railroad in a safe and efficient operating condition, though the area served was abundant in lumber, sand, gravel, cement and other natural resources which, for the stability and welfare of the region, needed to be shipped by rail. It was declared that,

at a rental cost of $1.25 each, per day, nine freight cars of other railroads had not been and could not be returned to their owners until the washed-out fill was restored. It was asserted that certain of the relators stood ready and willing to loan a sufficient amount of money to a receiver to be appointed by the court to accomplish the purpose of repairing the railroad, so as to place it in a safe operating condition. The bill charged that the defendant corporation, its officers, operators and owners, had failed to exercise powers conferred by law and essential to its corporate existence and had pursued a course by nonuser equivalent to abandonment, surrender and forfeiture of the franchise granted it by the State of Tennessee, making it incumbent upon the Chancery Court to appoint a receiver with authority and instructions to operate the railroad in accordance with powers conferred by law.

The Chancellor immediately appointed a receiver of the railroad properties and directed him to take possession; repair the roadbed; re-establish train service; borrow sufficient funds to make necessary repairs and operate the railroad, pledging its assets as security; collect all accounts due it and make all proper disbursements; hire necessary employees; and, subject to the orders of the court, to hold all funds coming into his hands as receiver and not disbursed in the repair and operation of the railroad. The receiver was also authorized to employ counsel; and the owners of the railroad, their attorneys, employees and representatives were enjoined from in any way interfering with the receiver in the discharge of his duties as prescribed by the state court.

The reorganization proceeding under section 77 of the National Bankruptcy Act, Title 11, U.S.C.A. § 205, was filed by the Smoky Mountain Railroad in the United States District Court on March 20, 1947. The petition of the State of Tennessee now under consideration avers that "the District Judge at Chambers, without notice to anyone, approved the petition at Chambers, appointed John W. Bush Temporary Trustee and placed him in immediate possession of the property which he held until the 18th day of April 1947 (a period of eight-

een days), at the end of which time he filed a report recommending to the Court that the Trustee be authorized and directed to proceed with the prosecution of the petition for permission to abandon the operation of Debtor's line which had been filed with the Interstate Commerce Commission." It is pointed out that this action of the District Judge was in violation of the provisions of the Railroad Reorganization Act for notice and advertisement and for approval of the Interstate Commerce Commission before a trustee may be appointed to take possession of a railroad property, and also in the teeth of another express provision of the Act: "Prior to the appointment of a trustee, the debtor on behalf of the court shall continue in the possession of the property and shall operate the business thereof during such period, and shall have all the title to the property and shall exercise all power consistent with the provisions of this section, subject at all times to the control of the judge, and to such limitations, restrictions, terms and conditions as he may from time to time impose and prescribe."

The State insists that the illegally appointed temporary trustee had no lawful right to possession of the railroad property when, on March 25, 1947, the State of Tennessee filed its quo warranto suit in the Chancery Court. of Sevier County. The appointment by the United States District Court of Maloney as trustee was not approved by the Interstate Commerce Commission until May 8, 1947. The State contends that the United States District Court did not have lawful possession of the railroad property on March 25, 1947, at the time of the appointment of the state court receiver; and that, therefore, the state court was entitled to take possession of the property and was wrongfully restrained from doing so by an unwarranted injunctive order of the district court.

■■■ The State District Attorney General was supported by the Tennessee Statutes in instituting the ex rel. proceedings in the Chancery Court of Sevier County. The Code of Tennessee provides in section 9336 that an action lies in the name of the State against a corporation doing or omitting acts which amount to a surrender or forfeiture of its rights and privileges as a corporation; or in exercising powers not conferred by law, or in failing to exercise powers conferred by law and essential to the corporate existence. Section 9338 provides that the suit shall be brought by bill in equity, filed either in the circuit or the chancery court of the county in which the corporation holds its meetings or has its principal place of business. Section 9344 empowers the state court, upon the filing of the bill, properly verified, in all proper cases to grant attachments and injunctions and appoint receivers to effect the ends of justice, and to make all such orders, rules and decrees, according to the practice of a court of chancery, as may be necessary to accomplish the objects had in view. Section 9352 of the Tennessee Code provides that if it be adjudged that a defendant corporation has, by neglect, nonuser, abuse, or surrender, forfeited its corporate rights, judgment will be rendered that the defendant be altogether excluded from such rights and be dissolved; and also that the corporation, its directors or managers, as the case may be, shall pay the cost.

Quo warranto is an ancient common law remedy which has long ·been available against usurpation of corporate franchises, or against their abuse or non-use by existing corporations. Generally, state statutes, as in the case of Tennessee, have been enacted to prescribe the conditions for the exercise of the power of the State in quo warranto proceedings. Moreover, Congress has recognized the necessity for use of quo warranto by vesting in the United States District Court for the District of Columbia authority to issue a quo warranto against persons exercising within the District any corporate rights, privileges, or franchises, not granted them by the laws in force in the District. See Title 28, U.S.C.A. § 377a et seq. There can be no doubt that the State of Tennessee had appropriate legal authority to institute the quo warranto proceeding in the State Chancery Court.

Numerous motions were filed in the United States District Court in unsuccessful attempts to induce the District Judge to dismiss the reorganization proceeding for

want of good faith of the owners of the railroad and for lack of jurisdiction in the court. The court was repeatedly urged to dissolve its injunction against the ex rel. proceedings in the state court, instituted by the State of Tennessee.

The Tennessee Railroad and Public Utilities Commission, on March 27, 1947, moved to dismiss the reorganization proceeding upon the ground that it was not in good faith and that the appointment of a temporary trustee was void because made without notice and without the approval of the Interstate Commerce Commission. On the same date, eleven shippers, joined by the Louisville & Nashville Railroad Company, a creditor, intervened in the reorganization proceeding and moved the court to withdraw its order approving the petition for reorganization and appointing a trustee for the same reasons stated by the Utilities Commission with the additional assertions that the debtor railroad company had failed to operate its trains and to discharge its duty to the public since January 20, 1947, had filed a petition with the Interstate Commerce Commission for authority to abandon operations, and that the debtor's purpose in the entire proceeding was not to bring about a reorganization of the railroad for continuing operations and discharging its public duty but was to procure a ratification of the railroad's abandonment without following the exclusive procedure prescribed by Congress in the Transportation Act, Title 49, U.S.C.A. § 1, paragraphs 18, 19, 20.

On April 1, 1947, the State of Tennessee, "without submitting to the jurisdiction of the United States District Court for the Eastern District of Tennessee but appearing specially for the purpose of denying the right of the said District Court to enjoin the quo warranto proceeding by the State of Tennessee in the Chancery Court of Sevier County, Tennessee," moved that the reorganization petition be dismissed. The motion stated that the suit in the state court was lawfully brought by the State of Tennessee in its sovereign capacity; that the injunction prayed for in the quo warranto suit had been granted; that a receiver had been appointed, but that out of courtesy to the United States District

Court the receiver had not taken charge of the property and the injunction had not been put into effect pending a hearing in the reorganization cause which had been set by the United States District Judge for April 18, 1947; and that the State would take no further steps in the state court suit until after the hearing in the United States District Court. The motion asserted that the issuance of an injunction as prayed in the petition of the railroad company would be in violation of the Constitution of Tennessee and of the Eleventh Amendment to the Constitution of the United States, inasmuch as the United States District Court has no jurisdiction to entertain a suit against a sovereign state. The motion was overruled; and, on April 11, 1947, the district court entered an order enjoining the State of Tennessee, ex rel., and the relator shippers from proceeding in the Chancery Court of Sevier County until the further orders of the United States District Court.

■■■ In Worcester County Trust Co. v. Riley, Controller of California et al., 302 U.S. 292, 296, 297, 299, 300, 58 S.Ct. 185, 82 L.Ed. 268, the Supreme Court pointed out that it was not even denied that a suit nominally against individuals, but restraining or otherwise affecting their action as state officers, may be in substance a suit against the state, which the Constitution forbids (citing Louisiana v. Jumel, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448; Hagood v. Southern, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805; North Carolina v. Temple, 134 U.S. 22, 10 S.Ct. 509, 33 L.Ed. 849; Smith v. Reeves, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140; Ex parte State of New York, No. 1, 256 U.S. 490, 500, 41 S.Ct. 588, 65 L.Ed. 1057; and other cases); or that generally suits to restrain actions of state officials can, consistently with the constitutional prohibition, be prosecuted only when the action sought to be restrained is without the authority of state law, or contravenes the statutes or Constitution of the United States (citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A., N.S., 932, 14 Ann.Cas. 764; Scully v. Bird, 209 U.S. 481, 28 S.Ct. 597, 52 L.Ed. 899; Old Colony Trust Co. v. Seattle, 271 U.S.

426, 46 S.Ct. 552, 70 L.Ed. 1019; and certain of the cases cited in support of the first proposition). Mr. Justice Stone (later Chief Justice) said [302 U.S. 292, 300, 58 S.Ct. 188]: "Since the proposed action is the performance of a duty imposed by the statute of the state upon state officials through whom alone the state can act, restraint of their action, which the bill of complaint prays, is restraint of state action, and the suit is in substance one against the state which the Eleventh Amendment forbids. * * * Unlike that in Ex parte Young, supra, and in the many cases which have followed it, the present suit is not founded on the asserted unconstitutionality of any state statute and the consequent want of lawful authority for official action taken under it." The opinion of the Supreme Court was unanimous in holding that state taxing officials, who sought through judicial proceedings to assess in pursuance of the laws of the state succession taxes on intangible property of persons domiciled in the state at the time of death could not be constitutionally brought into a federal court by interpleader. In the instant controversy, no challenge has been made to the constitutionality of the sections of the Tennessee Code under which the State of Tennessee instituted its quo warranto proceeding in a chancery court of that state.

In Missouri v. Fiske, 290 U.S. 18, 25, 26, 28, 54 S.Ct. 18, 20, 78 L.Ed. 145, we confront again an unanimous opinion upon the subject matter. Chief Justice Hughes said: "The Eleventh Amendment is an explicit limitation of the judicial power of the United States. 'The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.' However important that power, it cannot extend into the forbidden sphere. Considerations of convenience open no avenue of escape from the restriction. The 'entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given.' Ex parte State of New York, 256 U.S.

490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057. Such a suit cannot be entertained upon the ground that the controversy arises under the Constitution or laws of the United States. Hans v. Louisiana, 134 U.S. 1, 10, 10 S.Ct. 504, 33 L.Ed. 842; Palmer v. Ohio, 248 U.S. 32, 34, 39 S.Ct. 16, 63 L.Ed. 108; Duhne v. New Jersey, 251 U.S. 311, 313, 314, 40 S.Ct. 154, 64 L.Ed. 280. * * * Here respondents are proceeding against the state ·itself to prevent the exercise of its authority to maintain a suit in its own court. * * * But, when the· the state does not come in and withholds its consent, the court has no authority to issue process against the state to compel it to subject itself to the court's judgment, whatever the nature of the suit. (Citing authorities.)" In the case at bar, the injunction of the United States District Court was in effect directly against the State of Tennessee to prevent the exercise of its lawful authority, expressly granted by statute, to maintain the quo warranto proceeding which it instituted in one of its own courts vested with jurisdiction.

An ·elucidating discussion of the inhibitive effect of the Eleventh Amendment may be found in the opinion of Mr. Justice Pitney in Ex parte State of New York, No. 1, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057. Among the many cases in which a suit against a state official has been held to be, in fact, a suit against the State within the inhibition of the Eleventh Amendment, we direct attention to North Carolina v. Temple, 134 U.S. 22, 30, 10 S.Ct. 509, 33 L.Ed. 849, and Smith v. Reeves, 178 U.S. 436, 440, 20 S.Ct. 919, 44 L.Ed. 1140.

The ·Supreme Court of Tennessee has applied to a turnpike company the general rule that a corporation charged with the performance of public duties or possessing powers which are given in return for some public good cannot dispossess itself of its franchises or of its property necessary to enable it to discharge its public duties. Moreover, in that case, a suit brought in the name of the State of Tennessee by its District Attorney General on relation of citizens against the turnpike company, organized under the laws of Ten-

nessee, was held to be for the benefit of the whole people and not for the benefit of the relators. State ex rel. v. Lebanon & Nashville Turnpike Co., 151 Tenn. 150, 268 S.W. 627. A fortiori, the principles would apply to a corporation organized under the laws of Tennessee to operate a railroad.

Returning to the narrative of the State of Tennessee in its petition under consideration, the debtor, Smoky Mountain Railroad, filed on September 20, 1947, its proposed plan of reorganization which the Interstate Commerce Commission held to be impracticable. The Railroad Reorganization Act expressly provides that no plan of reorganization shall be approved or confirmed by the Judge unless it shall first have been approved by the Commission and certified to the court. 11 U.S.C.A., § 205, sub. d. The Act further provides that if, in the light of all existing circumstances, there is undue delay in a reasonably expeditious reorganization of the debtor, the Judge, in his discretion, shall, on motion of any party in interest or on his own motion, after hearing and after consideration of the recommendation of the Commission, dismiss the proceedings; whereupon, all right, title, or interest of the trustee shall vest by operation of law in the debtor, unless otherwise provided in the order of dismissal. Title 11, U.S.C.A., § 205, sub. g.

The Supreme Court in Ecker v. Western Pacific R. Corp., 318 U.S. 448, 466-476, 63 S.Ct. 692, 87 L.Ed. 892, describes the functions of the court in railroad reorganization proceedings under section 77 of the Bankruptcy Act. The opinion makes it clear that the legislative intent places reorganization under the leadership of the Interstate Commerce Commission subject to a degree of participation by the court, and places upon the Commission the primary responsibility for development of a suitable plan. Mr. Justice Reed said: "Another restriction on court action is that the determination as to whether the plan is 'compatible with the public interest' rests as valuation does, with the Commission. Subsection d." At page 473 of 318 U.S., at page 707 of 63 S.Ct. It is clear beyond question that the Act contemplates that the operation of railroads shall be continued for the benefit of the public, regardless of the interests of creditors and stockholders when clashing with the public interest.

Thompson, Trustee, et al. v. Texas Mexican Railway Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132, holds that a railroad carrier which is being organized under the Reorganization Act is not exempt from the requirement of Title 49 U.S.C.A. § 1 (18), that operation must be continued until a certificate is issued by the Interstate Commerce Commission authorizing abandonment of operation. Moreover, it was held that maintenance of a suit against the estate of a debtor railroad in reorganization under section 77 of the Bankruptcy Act, for acts of the trustee in operating trains over the grantor's tracks, was not precluded by stay orders issued by the bankruptcy court. The maintenance of such a suit was considered not to be inconsistent with the provisions of section 77 of the Bankruptcy Act which grant the reorganization court exclusive jurisdiction of the debtor and its properties, wherever located. The exclusive jurisdiction of the bankruptcy court was considered to be determinable by the "main purpose" of the suit.

In Smith, Trustee, et al. v. Hoboken Railroad, Warehouse and Steamship Connecting Co., et al., 328 U.S. 123, 130, 131, 66 S.Ct. 947, 90 L.Ed. 1123, 168 A.L.R. 497, it was held that the discontinuance of operations over leased railroad tracks and facilities by the trustee appointed in a railroad reorganization proceeding was an "abandonment" of operations by the carrier within the meaning of Title 49 U.S.C.A. § 1(18). The opinion of Mr. Justice Douglas quoted from the opinion in Ecker v. Western Pacific R. Corp., supra, 318 U.S. at page 468, 63 S.Ct. 692, and declared that the Interstate Commerce Commission, in the preparation of a plan of reorganization, is guided, not only by the requirements that the plan be fair, equitable and feasible, but also by the duty of preparing a plan that [328 U.S. 123, 131, 66 S.Ct. 952] "will be compatible with the public interest."

Gardner, Trustee v. New Jersey, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504, holds that Congress possesses constitutional power to vest in a reorganization court jurisdiction over the proof and allowance of a State's claim and lien for taxes; and that the exercise of that power under section 77 of the Bankruptcy Act was not a suit against the State within the constitutional inhibition. There is nothing in the opinion, however, to warrant the assumption that the United States District Court has the power to enjoin a lawful state quo warranto proceeding against its own corporate creature to preserve continuous operation of a railroad, chartered to operate its lines wholly within the state. Indeed, continuous operation of the road as a going concern is shown to be one of the purposes of section 77. The Supreme Court said at page 577 of 329 U.S., at page 473 of 67 S.Ct.: "It is the exclusive jurisdiction of the reorganization court which gives it power to preserve the railway as a unit and as a going concern and to prevent it from being divided up and dismembered piecemeal. Only in that way can continuous operation of the road be assured and a plan of reorganization be effected which not only safeguards the interests of the various claimants but is also compatible with the public interest."

On December 20, 1947, the State renewed its motion of April 1, 1947, for the reasons stated therein and for the additional reasons that the original proceeding was not filed in good faith and the "so-called reorganization plan" filed by the railroad company and its owners with the Interstate Commerce Commission had been found impracticable, in consequence of which the debtor had "lost the right of protection by the court as provided by the Act so that the court no longer has jurisdiction of the subject matter." On the same date, the shippers filed a similar motion. The District Court waited three and one-half months before ruling on the motions.

On December 28, 1947, the debtor and the stockholders petitioned the court to direct the trustee to revive and prosecute the debtor's petition, then on file with the Interstate Commerce Commission, for per-

mission to abandon its line of railroad. On January 6, 1948, the State moved to dismiss the petition of the debtor and its stockholders. The State's motion pointed out that section 77 of the Bankruptcy Act furnished no authority for the action requested by the debtor and the stockholders; that the trustee is not the representative of any one class but is an officer of the court appointed to protect the property and all classes interested in it or in the operation of the railroad during the period provided by the Act for a bona fide reorganization; and that sole and original jurisdiction to abandon a railroad is conferred by Congress upon the Interstate Commerce Commission by the Transportation Act, which provides that no railroad carrier shall abandon all or any portion of its lines, or the operation thereof, unless and until the Commission has issued a certificate that the present or future public convenience and necessity permits of such abandonment. The motion again charged lack of good faith of the debtor, and lack of jurisdiction of the district court to proceed further. A similar petition was filed by the shippers. The motions were not acted upon by the court until April 3, 1948, when they were overruled, at least inferentially.

On February 12, 1948, the State again filed a motion for vacation of the injunction against its proceeding in the Chancery Court of Sevier County and for dismissal of the reorganization proceeding upon the grounds set forth in its motions which had not been acted upon. Nearly two months later, the district court finally overruled the motion and, in doing so, inferentially overruled the previous motions which had not been acted upon.

The petition of the State and the shippers asserts that the district court ignored its motion for a direction to the trustee to report any facts pertaining to irregularities, fraud, misconduct, or mismanagement, as required by Title 11 U.S.C.A. § 205, sub. c, paragraph 9; and that when counsel for the shippers put the trustee upon the stand and asked him to produce the list of all irregular or fraudulent transactions on the part of the owners revealed by the books, the district judge refused to admit the tes-

timony on the ground that it would be hearsay. The petition avers further that on January 9, 1948, the State and the shippers filed a petition setting forth various fraudulent acts on the part of the owners prior to the filing of the petition for reorganization, and called upon the court to comply with the Act and to direct the trustee to file a report in compliance with its provisions. This the trustee "finally did on February 12, 1948, after the Court had removed Ambrose as attorney for the trustee on the ground that he was representing conflicting interests."

The report of the trustee showed very serious irregularities, indeed dishonest acts, on the part of the officers and owners of the railroad. His full report is set forth in the footnote.[1]

A leading authority upon the issuance of writs of mandamus is In re Winn, 213 U.S. 458, 465–468, 29 S.Ct. 515, 518, 53 L.Ed. 873, where the governing principles are clearly and succinctly discussed. It was pointed out that authority to issue the writ was given to the Supreme Court in the original Judiciary Act, 28 U.S. C.A. § 342. The opinion asserted: "The writ of mandamus was introduced to supplement the existing jurisdiction of the courts and to afford relief in extraordinary cases where the law presents no adequate remedy. High on Extraordinary Legal Remedies, 3d ed., § 15. But where, without any right, a court of the United States has wrested from a state court the control of a suit pending in it, an appeal or writ of error, at the end of long pro-

---

[1] Your Trustee would further show to the Court that examination and investigation of the books, correspondence, files and other information contained in the company records would seem to indicate the following irregularities:

(1) The railroad during the years 1943 through 1946, sold coal to Stokely Bros., which had been purchased to the account "Train Fuel." There is no record that the proceeds from such sales were recorded to this account.

(2) Prior to 1942 the salaries of the President and Vice President were each $3,900.00 per year. Effective Jan. 1, 1942, these salaries were increased to $12,000.00 per year. These salaries were continued during 1943 and were drawn in advance for the latter year. Said salaries were charged to the account listed as "Miscellaneous Accounts Receivable."

(3) In 1943 a dividend of $37,500.00 was paid, which amount represented 50% of the par value of the outstanding capital stock. From 1942 through 1946 the company purchased maintenance supplies from Railway Construction Corporation and Midwest Steel Corporation, which corporations were owned and operated by the owners of Smoky Mountain Railroad.

(4) One item in this group represents purchase of cross ties from TVA. "The contract for said purchase being between Smoky Mountain Railroad and TVA. The contract price being $1,750.-00." However, it appears that these ties were paid for by Railway Construction Corporation and subsequently billed to the railroad for $5,000.00. Part of these ties, some 2,500 were sold to the

Diamond Coal Mining Co., at 75¢ each, and 4,263 to the Emory River Railroad Co., at 75¢ each, or a total of $5,193.25. No part of this money seems to have been received by the Railroad Company.

(5) During the year 1942, the Railway Construction Corporation sold a railroad 113,616 board feet of second hand bridge timber at $50.00 M.B.M. or a total of $5,680.00. This material was also shipped by the Midwest Steel Corporation from Johnson City, Tennessee, and apparently was obtained from the Southern Railroad. In December 1943, the railroad shipped a carload of second hand timber, presumably a portion of the timber referred to above, to the Diamond Coal Company. However, there is no indication that the railroad received credit for this carload of timber.

(6) On Jan. 4, 1943, the carrier shipped a carload of scrap rail from Sevierville to the Standard Iron & Steel Co., Knoxville, Tenn. There is no indication that the Railroad's account received credit for this scrap. In 1942 three cars of scrap were shipped to Knoxville. There is nothing to indicate that these cars covered a waybill. Therefore this transaction is not clear. On Dec. 16, 1946, 116,000 pounds of scrap rail was billed by the railroad to the Standard Iron & Steel Co., Knoxville, and there is no indication that credit was received for this shipment.

(7) In May, 1942, a locomotive was purchased from the Railway Construction Corporation for $12,500.00. The So. Ry. Co. indicates that this locomotive was purchased from them for $8,500.00.

ceedings, which must go for naught, is not an adequate remedy." It was made plain that a writ of mandamus must not be permitted to usurp the functions of an appeal, or of a writ of error, or take the place of such, where an adequate remedy to the aggrieved party is afforded; but that mandamus should be issued only where, on the face of the record, the lower court to which it is directed was without jurisdiction to take the action of which complaint is made. The writ of mandamus was directed to the United States Circuit Judge to remand the case to the state court in which it was originally brought.

■ Among other cases in which the Supreme Court of the United States issued writs of mandamus to inferior courts are Ex parte Bradley, 7 Wall. 364, 74 U.S. 364, 19 L.Ed. 214; Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667; Ex parte Metropolitan Water Co., 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575; In re Washington and Georgetown Railroad Company, 140 U.S. 91, 11 S.Ct. 673, 35 L.Ed. 339. No discussion of the subject of mandamus would be adequate without at least making reference to the opinion of Chief Justice Marshall in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60. In Virginia v. Rives, supra, 100 U.S. at pages 323, 324, the Supreme Court said: "In what case such a writ [mandamus] is warranted by the principles and usages of law it is not always easy to determine. Its use has been very much extended in modern times, and now it may be said to be an established remedy to oblige inferior courts and magistrates to do that justice which they are in duty, and by virtue of their office, bound to do. It does not lie to control judicial discretion, except when that discretion has been abused; but it is a remedy when the case is outside of the exercise of this discretion, and outside the jurisdiction of the court or officer to which or to whom the writ is addressed. One of its peculiar and more common uses is to restrain inferior courts and to keep them within their lawful bounds. Bacon's Abridgment, Mandamus, Letter D; Tapping on Mandamus, 105; 3 Bl.Com. 110."

The principle remains unchanged. In 1943, Chief Justice Stone wrote: "The historic use of writs of prohibition and mandamus directed by an appellate to an inferior court has been to exert the revisory appellate power over the inferior court. The writs thus afford an expeditious and effective means of confining the inferior court to a lawful exercise of its prescribed jurisdiction, or of compelling it to exercise its authority when it is its duty to do so. Such has been the office of the writs when directed by this Court to district courts, both before the Judiciary Act of 1925, 43 Stat. 936, and since." Authorities were cited in two footnotes. Ex parte Peru, 318 U.S. 578, 583, 63 S.Ct. 793, 796, 87 L.Ed. 1014.

In Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, the Supreme Court held that, in a reorganization proceeding under section 77 of the Bankruptcy Act, the bankruptcy court has jurisdiction to enjoin creditors holding collateral notes of the debtor railroad, secured by its bonds and bonds of its subsidiaries, from selling the collateral under power of sale in the notes, where such sale would so hinder, obstruct and delay the preparation and consummation of a plan of reorganization as probably to prevent it. It is important not to overlook the observation of Mr. Justice Sutherland at page 676 of 294 U.S., page 606 of 55 S.Ct. of the opinion that a proceeding under section 77 is not an ordinary proceeding in bankruptcy; but is "a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised"; and that "to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile."

Section 265 of the Judicial Code, Title 28 U.S.C.A. § 379, provides that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

The Supreme Court, in Treinies v. Sunshine Mining Co., et al., 308 U.S. 66, 74, 60 S.Ct. 44, 84 L.Ed. 85, construed this section as a mere limitation upon the general

equity powers of the United States Courts, and said that it may be varied by Congress to meet the requirements of federal litigation. In making the assertion, however, the court was holding that the Interpleader Act, 28 U.S.C.A. § 41(26), passed subsequently, authorizes the enjoining of parties to the Interpleader from further prosecution of any suit in any state or United States court on account of the property involved; and that such authority is essential to the protection of the interpleader jurisdiction and is a valid exercise of judicial power. We find nothing in the opinion to justify the thought that a sovereign State may be enjoined, in the circumstances found here, from prosecuting a quo warranto proceeding in its own court, where the obvious purpose of those who filed a proceeding in the Federal Court was not to reorganize a railroad so as to operate it but was plainly to obtain administrative and judicial sanction to the abandonment of operation.

Section 262 of the Judicial Code, Title 28 U.S.C.A. § 377, provides that the Supreme Court, the circuit courts of appeal and the district courts shall have power to issue all writs not specifically provided for by statute, "which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law."

In Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 25, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185, though the facts encountered led to the conclusion that mandamus had been used as a substitute for an appeal contrary to the statutes and policy of Congress, the Supreme Court stated that the authority of the circuit courts of appeal under section 262 "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected." The opinion stated: "The traditional use of the writ [mandamus] in aid of appellate jurisdiction both at common law and in the federal courts has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is

its duty to do so." (Citing Ex Parte Peru, supra, and other cases.)

If the allegations of the petitioner are true, it is obvious that the Smoky Mountain Railroad Company and its owners and officers, Silverstein and Kesselman, have misused the proceeding authorized by section 77 of the Bankruptcy Act, which prescribes the procedure for bona fide reorganization of railroad corporations, in that their real purpose throughout has not been to reorganize and operate the Smoky Mountain Railroad but to abandon it. Indeed, they had already abandoned operation of the railroad when they filed the petition; and they made no attempt to obtain authority of the district court to direct the trustee appointed by it to take steps toward restoring the railroad's operations pending the working out of a reorganization plan that would meet the approval of the Interstate Commerce Commission and the United States District Court.

In all the circumstances of the case, as averred in the petition, the United States District Court was without jurisdiction to enjoin the quo warranto proceedings brought in the Chancery Court of Sevier County, Tennessee, by the State of Tennessee, through its District Attorney General on relation of the eleven shippers. Moreover, on the allegations of the petition it is apparent that the cause not being a bona fide suit for reorganization, the court was not authorized to retain jurisdiction and should have sustained the various motions to dismiss which have been reviewed in detail.

Accordingly, it is ordered that the District Judge file answer to the petition on or before twenty days from the entry of this order to show cause why this court should not direct him, as prayed in the petition: (1) To dismiss the petition of the Smoky Mountain Railroad seeking to enjoin the State of Tennessee ex rel. from proceeding with its suit in the Chancery Court of Sevier County, Tennessee; (2) to withdraw the stay order enjoining the State from proceeding with its suit in that court; (3) to direct the trustee to turn over to an officer designated by that court the railroad described in the petition; (4)

to dismiss the debtor's suit for reorganization, the district court being without jurisdiction to proceed; and (5) to grant such other relief as the petitioner may be entitled to in the premises.

Should the District Judge, upon consideration of this opinion, reach the conclusion that the prayer of the petition should be granted, he will enter an appropriate order dissolving the injunction issued by him restraining the State of Tennessee and its relators from proceeding with the suit filed on March 27, 1947, in the Chancery Court for Sevier County, Tennessee, and dismissing the reorganization proceeding filed in the United States District Court on March 20, 1947. In such event, in lieu of an answer to the show-cause order entered simultaneously the District Judge may file in this court a certified copy of the order entered by him.

This course is suggested, inasmuch as proceedings of this character, involving the public interest, should be speedily determined. See last sentence at page 675 of the opinion in Continental Illinois Nat. Bank & Trust Co., v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, at page 606. See, also, Guaranty Trust Co. of New York v. Henwood 8 Cir., 86 F.2d 347, 108 A.L.R. 1020.

For former opinion, see 166 F.2d 997.

Laing, Gray & Smith, Henry S. Gray and John R. Becker, all of Portland, Or., for appellant.

King, Wood, Miller & Anderson and Robert S. Miller, all of Portland, Or., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.