SUHRHEINRICH, Circuit Judge,
dissenting.
I dissent because I believe that the Eleventh Amendment bars all of the claims in this case. Further, the state law claims should have been dismissed under the doctrine of Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Finally, to the extent that Plaintiffs have stated a valid federal equal protection claim for prospective injunctive relief, I would dismiss that claim because the state law at issue has a rational basis and is therefore not unconstitutional.
I.
The case before us involves a straightforward application of Eleventh Amendment principles. In Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court held that the Eleventh Amendment bars suits against a state by its own citizens. Barton v. Summers, 293 F.3d 944, 948 (6th Cir.2002). Here, the state is not a named party; various state officials are the named defendants. The Eleventh Amendment does not preclude official capacity suits against state officials for injunctive relief. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). However, it prohibits a federal court from awarding retroactive monetary relief against state officials when those damages will be paid by the state treasury. See, e.g., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ford Motor Co. v. Dep’t of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). In Ford Motor Co., the Supreme Court said: “[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.” Ford Motor Co., 323 U.S. at 464, 65 S.Ct. 347. In short, “[a] federal court may order future compliance by state officials, but it may not compel payment of damages to compensate for past violations.” Erwin Chemerinsky, Federal Jurisdiction 425 (4th ed.2003).
So the central question in this case is whether the state is the real, substantial party in interest even though the named defendants are Douglas B. Roberts, Treasurer of the State of Michigan; Christopher DeRose, Director, Department of Management and Budget Office of Retirement Systems; George M. Elworth, Member of the Michigan Judges Retirement Board (“MJRB”); Roy Pentilla, Member of the MJRB; Eric E. Doster, Member of the MJRB; Lyle Van Houten, Member of the MJRB; and Robert Ransom, Member of the MJRB.[1] To rephrase the issue a bit: by providing the requested relief, would we be ordering prospective injunctive relief, or monetary damages? And if the latter, where would the money come from?
II.
To answer these questions, we must examine the nature of the relief sought, *395 which means examining the complaint. Precedent directs that “ ‘[a] federal court must examine each claim in a case to see if the court’s jurisdiction over that claim is barred by the Eleventh Amendment.’ ” Henry v. Metro. Sewer Dist., 922 F.2d 332, 337 (6th Cir.1990) (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Counts I, III, V, and VII of the Complaint are based on the Equal Protection Clause of the Fourteenth Amendment and are brought pursuant to 42 U.S.C. § 1983. Count I alleges that the Act violates Plaintiffs’ rights because judges of the 36th District Court are entitled to retirement allowance under the Tier I Plan which exceed that to which Plaintiffs and are entitled even though judges of the 36th District Court contribute a smaller percentage of their compensation into the Tier 1 Plan for that greater retirement allowance.
Count III alleges that the Act does not provide for annual percentage increases in the retirement allowance paid under the Tier 1 Plan although certain of the statutes creating the retirement plans of other state and governmental employees provide for an annual percentage increase in the retirement allowance paid. Count V challenges the constitutionality of the Act because it prescribes the calculation of the retirement account value of the judges who transferred from the Tier 1 Plan to the Tier 2 Plan in a disparate manner. Count VII alleges that the Act violates the constitutional rights of Plaintiffs because per the terms of the Act judges of the 36th District Court who elected to transfer from the Tier 1 Plan to the Tier 2 Plan were able to transfer substantially greater amounts of money than non-36th District Court judges of the same age and same length of service because the Act, as complained of in Count I, afforded 36th District Court judges a higher allowance under the Tier 1 Plan.
Counts II, IV, VI, and VIII mirror Counts I, III, V, and VII, but instead of being founded upon the Equal Protection Clause of the Fourteenth Amendment, are founded upon Article I, Section 2 of the Michigan Constitution. Counts IX and X assert state law claims for wasting trust and breach of fiduciary duty, respectively.
Also critical to the. analysis is the relief requested. Plaintiffs’ prayer for relief reveals that the primary thrust of the suit is to obtain monetary relief.[2] In Paragraph 4, Plaintiffs ask that Defendants refund to members and beneficiaries of the Tier 1 Plan “that portion of their past contributions into the Tier 1 Plan in excess of the past contributions required of judges of the 36th District Court.”[3] In Paragraph 5, Plaintiffs ask the court to afford to Plaintiffs who have remained members of the Tier 1 Plan but have not yet retired “a retirement allowance upon their retirements equal to that to which [comparable] judges of the 36th District Court” are or will be entitled.[4] Paragraph 6 seeks resti *396 tution in the form of “the difference between the dollar amount of retirement allowance” that Plaintiffs have received “and the greater amount of retirement allowance they would have received” if they were 36th District Court judges.[5] Paragraph 7 seeks an annual percentage increase in retirement allowance equivalent to the annual percentage increases afforded to other state funded retirement systems.[6] Paragraph 8 seeks restitution in the form of “the difference between the dollar amount of retirement allowance equivalent to those afforded by other state funded retirement systems.”[7] Although couched in equitable terms, Paragraphs 4 through 8 in reality seek compensation for the State’s past action which Plaintiffs perceive as inequitable.
Paragraphs 9 through 11 similarly seek to correct past errors by requiring Defendants to recalculate how benefits should be calculated.[8] Plaintiffs also seek an order allowing them to revoke their original elections to participate in the Tier 2 Plan so that they can make their elections effective as of some different date in time. Paragraph 12 asks the court to order the defendants to pay excess contributions.[9] In *397 short, the foregoing assertions all seek the equivalent of money damages that are more than incidental, and seek retroactive monetary relief. Paragraphs 13 through 16 are not related to the federal constitutional claims, but are based on Plaintiffs’ “wasting trust” claim under state law.[10] Paragraphs 17 through 19 seek attorney fees, interest, and any other appropriate relief.[11] Although not claims for prospective injunctive relief, they would likely be allowed as ancillary relief, see Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), but only if the action were otherwise proper under § 1983. These are not claims for prospective in-junctive relief. Only paragraph 3, which I will discuss momentarily, appears to seek prospective injunctive relief.[12]
III.
So the question becomes, if the requested relief is ordered, where would the money come from? Because all of the defendants are sued in their official capacities, it is anticipated that the monies would come from the related agencies, the JRS, and the state treasury (the state treasurer Douglas Roberts, is also a named defendant). This brings us to the next issue, is the JRS an arm of the state for purposes of the Eleventh Amendment? As the majority correctly states, “[i]n Eleventh Amendment analysis, the question of *398 whether a public entity is best characterized as an arm or alter ego of the state, instead of being deemed a political subdivision of the state, hinges on whether there is potential legal liability of the state treasury to satisfy a judgment.” Maj. Op. at 378-379 (footnote omitted). As this Court recently observed in Dubuc v. Michigan Bd. of Law Exam’rs, 342 F.3d 610 (6th Cir.2003): “To determine whether an entity is a state department or agency for purposes of the Eleventh Amendment, the primary issue is whether the state would ultimately be liable for any money judgment against the entity.” Id. (quoting Brotherton v. Cleveland, 173 F.3d 552, 560-61 (6th Cir.1999)).[13]
As the majority notes, there are two ways in which potential legal liability for a judgment against the JRS might reach state treasury funds. “First, JRS funds might be co-mingled with general funds— which is to say that JRS funds might be available for general use by the state for other purposes, unrelated to the retirement system. If funds are co-mingled, then any JRS liability would be tantamount to state treasury liability.” The second method asks whether “even if JRS funds are segregated from state treasury funds, the JRS might not have sufficient funds to satisfy a judgment; applicable state law could make state treasury funds available to satisfy the part of the judgment that exceeded the amount of funds available to satisfy the part of the judgment that exceeded the amount of funds available to the JRS.” Maj. Op. at 380-381.
The majority concludes that under the first method, “JRS funds are kept in a separate trust from general state funds— thus, funds taken from the JRS to satisfy a judgment would not be funds from the state treasury.” Maj. Op. at 381.[14] In *399 other words, there is no commingling of funds. Regarding the second method, the majority recognizes that, other things being equal, the state treasury might be liable for any shortfall pursuant to Art. IX, § 24 of the Michigan Constitution. See Maj. Op. at 384-385. That provision states:
The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.
Musselman v. Governor, 448 Mich. 503, 533 N.W.2d 237, 240 n. 7 (1995), on reh’g on other grounds, 450 N.W.2d 574, 545 N.W.2d 346 (1996). The provision itself is clear, and Musselman further indicates that the state is obligated to prefund said benefits: “We hold that the state is obligated to prefund health care benefits under art. 9, § 24.” Id. at 246.
However, Musselman also held that Article IX, § 24 is not self-executing:
In other words, insofar as the plaintiffs are asking us to require the Legislature to appropriate funds for retirement health care benefits, we understand that the intention of the drafters was that the second sentence of Const.1963, art. 9, § 24 is not self-executing. Because the provision does not alter the rule that legislative action is necessary to appropriate funds, it fails to “ ‘lay[ ]down rules by means of which [its] principles may be given the force of law.’ ”
Id. (alteration in original; footnote omitted); see also id. (“However, because we have no authority to order the Governor or the Legislature to appropriate funds, mandamus is denied.”)
The majority acknowledges that “[a]b-sent the Musselman case, it might have been argued that the state treasury could have been held liable pursuant to Art. IX, § 24.” Maj. Op. at 384-385; see also id. at 379 n. 8 (“Various federal claims in this case clearly seek monetary relief, including the refund and payment of portions of *400 Plaintiffs’ contributions to the JRS.”). The majority nonetheless concludes that because Musselman “establishes that Art. IX, § 24 does not create any right of action that could force state treasury funds to be used to pay any judgment against the JRS,” Maj. Op. at 382, there is no Eleventh Amendment immunity bar to suit. See Maj. Op. at 379 n. 8 (“Because we hold that none of the claims for monetary relief are covered by Eleventh Amendment immunity, we need not reach the issue of whether there are any federal claims seeking only prospective, nonmone-tary relief.”). The majority’s conclusion that the Eleventh Amendment is not implicated, despite the provisions of Art. IX, § 24, is based on the following reasoning:
[tjhere can be no action in any court to force the state treasury to pay any part of a judgment relating to a federal claim in a lawsuit concerning the JRS — thus, the state treasury is not subject to potential legal liability. Even if the JRS lacked sufficient funds to satisfy a judgment in this case, the state treasury could not be held liable for any unpaid portion of the judgment.
Maj. Op. at 383-384.
In other words, the majority reasons that, because state law says that the money cannot come from the state treasury, a federal court could not order such relief either, so there is no need to worry about the Eleventh Amendment. This reasoning is faulty because a state’s exercise of state sovereign immunity does not control the question of federal constitutional immunity. Cf. Dubuc, 342 F.3d at 617 (stating that “[w]hile [a provision of the Michigan Supreme Court Rules Concerning the State Bar of Michigan providing the staff of the State Bar and the Board of Law Examiners] may immunize the individual defendants from state law claims, no state law or rule can immunize anyone from liability for violating the United States Constitution”).[15] In fact, on the flip side, the Supreme Court has consistently held that a state does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts. Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (citations omitted); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (“Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State’s intention to subject itself to suit in federal court.”); Pennhurst, 465 U.S. at 99-100 n. 9, 104 S.Ct. 900 (citations omitted); Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Assn., 450 U.S. 147, 150, 1981, 101 S.Ct. 1032, 67 L.Ed.2d 132 (per curiam); Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944) (“[I]t is not consonant with our dual system for the Federal courts to be astute to read the consent to embrace Federal as well as state court.... [A] clear declaration of the state’s intention to submit its fiscal problems to other courts than those of its own creation must be found”). By the same token, the state should not lose its constitutional immunity simply because it exer *401 cised its state sovereign immunity.[16] As the foregoing precedent establishes, the state must make its consent to suit in federal court clear.
The raison d’etre for the Eleventh Amendment is to protect, in a federal forum, a state’s exercise of sovereignty immunity. As recently observed by a majority of Justices in Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996):
Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, “we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.” Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). ... That presupposition, first observed over a century ago in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), ..., has two parts: first, that each State is a sovereign entity in our federal system; and second, that “ ‘[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,’ ” id., at 13, 10 S.Ct. 504 ... (emphasis deleted), quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A.Hamilton). See also Puerto Rico Aqueduct and Sewer Authority, supra, [506 U.S. 139 1993] at 146, 113 S.Ct. 684 (“The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity”). For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States “was not contemplated by the Constitution when establishing the judicial power of the United States.” Hans, supra, at 15, 10 S.Ct. 504.[7]
*402 Seminole Tribe, 517 U.S. at 54, 116 S.Ct. 1114. The majority’s unique use of state sovereign immunity doctrine as some kind of implied waiver of constitutional immunity constitutes an impermissible end run around the well-established principles of the Eleventh Amendment. If the state treasury is immune from liability for such purposes, it is because of the Eleventh Amendment and not Article IX, § 24 of the Michigan Constitution or the Mussel-man decision. And the Eleventh Amendment directs that if, as here, the state is the real party in interest, has not consented to suit in a federal forum, and monetary relief is sought, the suit must be dismissed.
Contrary to its assertion, the majority and I actually agree that state law plays a significant role in the Eleventh Amendment immunity analysis. However, I do not perceive Art. IX § 24 and the Mussel-man decision as leading to the conclusion that the JRS is not an arm of the state. Rather, I see them as confirming the contrary conclusion. Further, any funding requirement, even if it must be honored by the legislature and not ordered by a court, will necessarily impact on the state treasury. Cf. Fitzpatrick v. Bitzer, 519 F.2d 559 (2d Cir.1975), rev’d on other grounds, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). (holding that “[a] judgment against the Connecticut State employees fund would automatically increase the obligations of the general state treasury and amount to a judgment against the state” because the state was required to appropriate funds annually on an actuarial basis such that at least 75% of the total retirement income payment for each year had to made by the state). See generally Edel-man, 415 U.S. at 664, 94 S.Ct. 1347 (stating that “the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter” (internal quotations omitted)); see id. n. 11 (stating that “[t]he general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain” (internal quotations omitted)).
Finally, the majority fails to address the impact of Mich. Comp. Laws. § 38.2302, which imposes mandatory state contribution requirements:
Sec. 302. (1) Except as provided in subsection (2), the legislature shall annually appropriate to the retirement system the amount determined under subsection (2) in order to fund the retirement system the amount determined under the fiscal year for which the appropriation is made. The legislature shall annually appropriate to the retirement system the amount determined under subsection (3) in order to reconcile the estimated appropriation made in the previous fiscal year with the actual appropriation needed to adequately fund the retirement system for the previous fiscal year.
(2) The legislature shall annually appropriate to the retirement system an amount equal to 3.5% of the aggregate annual compensation of the difference between the sum of the contribution rates determined under section 301(2) and (3) multiplied by the aggregate annual compensation and the estimated revenue from court fees under section 304, whichever is greater. The department shall submit the amount determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year. If the department receives notification *403 from the United States internal revenue service that this subsection will cause the retirement system to be disqualified for tax purposes under the internal revenue code, this subsection does not apply and subsection (4) applies.
(3) Not later than 60 days after the termination of each state fiscal year, the bureau or retirement systems shall certify to the director of the department the actual aggregate annual compensation paid to all active members during the preceding state fiscal year and the difference, if any, between the actual actuarial funding requirement and the sum of the actual revenue received by the retirement system during the preceding fiscal year from the appropriation pursuant to subsection (2) or (4), whichever is applicable, employer contributions pursuant to section 303, court filing fees pursuant to section 304, and mandatory member contributions pursuant to section 305. The department shall submit the amount determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year.
(4) If applicable, the bureau of retirement systems in the department shall certify to the director of the department an amount equal to the difference between the estimate actuarial funding requirement for the next fiscal year and the sum of the estimated revenue to be received by the retirement system during the next fiscal year from employer contributions pursuant to section 303, court fees pursuant to section 304, and mandatory member contributions pursuant to section 305. The department shall submit the amount determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year.
Mich. Comp. Laws Ann. § 38.2302 (West 1997). See also § 38.2208 (stating that “[t]he retirement system shall draw its warrants upon the state treasury, payable out of funds of the retirement system, for the payment of retirement allowances, accumulated contributions, and the payment of salaries and other expenses necessary in the administration of the retirement system”). In my view, the foregoing provisions clearly reflect that the state considers the JRS a state agency, in the department of budget and management, §§ 38.2201(1), 38.2104(5), funded by the treasury, and not merely a political subdivision.
In sum, I would affirm the district court’s dismissal on the basis of Eleventh Amendment immunity.
IV.
Plaintiffs’ state law claims were also properly dismissed, although for reasons different than those stated by the district court. In Pennhurst State Sch. & Hosp. v. Halderman, supra, the Supreme Court held that the Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law, and also bars state law claims brought under pendent jurisdiction. 465 U.S. at 103-06, 104 S.Ct. 900. This is true whether the relief sought is prospective or retroactive. Id. In distinguishing federal claims against state officials from state law claims against state officials, the Court reasoned that:
This need to reconcile competing interests [the need to promote the supremacy of federal law v. the constitutional immunity of the States] is wholly absent, however, when a plaintiff alleges that a state official has violated state law. In such a case the entire basis for the doctrine of Young and Edelman disappears. A federal court’s grant of re *404 lief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that Young and Edelman are inapplicable in a suit against state officials on the basis of state law.
Id. at 106, 104 S.Ct. 900. Thus, even if only injunctive relief were sought, dismissal of Counts II, IV, VI, VIII, IX, and X was proper.
V.
Paragraph 3 asks the court to enjoin Defendants from requiring Plaintiffs who have remained as participants in the Tier 1 Plan to pay a larger contribution to the JRS than the 36th District Court judges. Although couched as prospective language, in essence Plaintiffs seek to require the allocation of state funds that are subject to the requirements of the Act.[17] Thus, the injunctive relief requested is not “truly prospective non-monetary relief,” and it is not incidental; therefore, the “primary thrust of the suit” remains the money. See Barton, 293 F.3d at 949. As we observed in Barton, “the interest of a sovereign in allocating state funds is a ‘very serious’ one,” and “an attempt to force the allocation of state funds implicates core sovereign interests.” Id. at 951 (quoting Kelley v. Metro. County Bd. of Educ., 836 F.2d 986, 995 (6th Cir.1987)). The Eleventh Amendment bars this type of claim as well. See Barton, 293 F.3d at 949-51 (discussing exception to doctrine of Ex Parte Young; stating that the injunctive relief must be truly prospective, non-monetary relief with only incidental impact on the state treasury, and that “[t]he dividing line, therefore, is whether the money or non-monetary injunction is the primary thrust of the suit”).
Furthermore, even if this claim — and any of the others for that matter — truly seeks prospective, nonmonetary injunctive relief and is therefore not barred by the Eleventh Amendment, relief is still not appropriate if there is no constitutional violation. In my view, dismissal was proper because the JRS has a rational basis and therefore its application does not violate the federal equal protection clause. See generally Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (holding that in equal protection cases not involving a suspect classification or fundamental right, courts apply a rational basis test). As the Michigan Supreme Court ruled in Harvey v. Michigan, 469 Mich. 1, 664 N.W.2d 767 (2003):
The state, by assuming the entire funding of the pensions of 36th District judges in the financially distressed city of Detroit, made those pensions more secure. Certainly the Legislature would or could understand that this would induce competent and qualified attorneys to become judges or to remain judges, just as the legislation did in Hughes [v. Judges Retirement Bd., 407 Mich. 75, 282 N.W.2d 160 (Mich.1979)]. Accordingly, we agree that the trial court’s holding that plaintiffs have not satisfied their burden to show that there was no rational basis for this legislation. Thus, the statute withstands constitutional scrutiny.
*405 Id. at 774.[18] I agree with the Michigan Supreme Court that the proper test is rational basis and that the Judges Retirement Act easily passes constitutional scrutiny. I would hold that Defendant state officials did not violate Plaintiffs’ equal protection rights by enforcing the provisions of the Judges Retirement Act.
VI.
For the foregoing reasons, I believe that we should affirm the judgment of the district court dismissing in its entirety Plaintiffs’ complaint.

. All of the defendants were sued in their official capacities.

. Paragraphs 1 and 2 request the court to certify the action as a class action and declare that the Act violates the Fourteenth Amendment and the State Constitution. Neither are claims for prospective, injunctive relief.

.
4. Order that Defendants forthwith refund to those Plaintiffs and members of The Class who are members, former vested members, retirants, or retirement allowance beneficiaries of the Tier 1 Plan, with interest, that portion of their past contributions into the Tier 1 Plan in excess of the past contributions required of judges of the 36th District Court[.]

.
5. Order Defendants to afford to Plaintiffs and The Class members who have remained members of the Tier 1 Plan but have not yet retired a retirement allow- *396 anee upon their retirements equal to that to which judges of the 36th District Court with the same age and length of service are or will be entitled[.]

.
6. Order Defendants to forthwith make restitution to Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries by paying to them, with interest, the difference between the dollar amount of retirement allowance that they have received and the greater amount of retirement allowance that they would have received if they had been judges of the 36th District Court[J

.
7. Order that Defendants forthwith afford to Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries of the Tier 1 Plan an annual percentage increase in retirement allowance equivalent to the annual percentage increase afforded by other state funded retirement systems which provide for annual percentage increases in benefits[.]

.
8. Order that Defendants forthwith make restitution to those Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries of the Tier 1 Plan by paying to them, with interest, the difference between the dollar amount of retirement allowance equivalent to those afforded by other state funded retirement systems.

.
9. Order Defendants to permit Plaintiffs and members of The Class the opportunity to terminate membership in the Tier 1 Plan and irrevocably elect to participate in the Tier 2 Plan as of a designated date certain each year, which date will be used for calculating APV[.]
10. Order Defendants to permit Plaintiffs and members of The Class who have elected to transfer from the Tier 1 Plan to the Tier 2 Plan the opportunity to have the Actuarial Present Value ("APV”) of their accounts recalculated as of a date subsequent to June 30, 1998 and order Defendants to transfer the difference between the recalculated APV and the APV previously calculated, with interest, from the reserves of the Tier 1 Plan to that person’s Tier 2 account.
11. Order that, as to Plaintiffs and members of The Class who have elected to transfer to the Tier 2 Plan, Defendants recalculate their APV as of the applicable APV date as though the Tier 1 Plan's accumulated benefit obligation to them was equivalent to that of a judge of the 36th District Court of the same age and length of service and transfer the difference between the recalculated APV and the APV previously calculated, with interest, from the reserves of the Tier 1 Plan to that person's Tier 2 Plan account[.]

.
12. Order Defendants to pay The Excess Contributions to members, retirants and retirement allowance beneficiaries of the Tier 1 Plan[.]

.
13. Preliminarily and permanently enjoin Defendants from transferring or paying monies from the Tier 1 Plan’s reserve for employer contributions to the court fee fund, from transferring or paying monies from the court fee fund to the court equity fund, and from transmitting court fees to the treasurer for deposit into the court fee fund instead of into the reserve for employer contributions [.]
14. Order Defendants to cause the preparation of an annual report for the current fiscal year and future fiscal years that fully and accurately reports all of the reserve accounts of the Tier 1 Plan and of the court fee fund and all activities of the Tier 1 Plan, including but not limited to the transfer or payment of monies out of the court fee fund into the court equity fund[J
15. Order Defendants to provide an accounting for past fiscal years of the various reserve accounts of the Tier 1 Plan, of the court fee fund, and of all of the activities of the Tier 1 Plan, including but not limited to the transfer or deposit of monies into and between the various reserve accounts of the Tier 1 Plan, the deposit of monies into the court fee fund, and the transfer of payment of monies out of the court fee fund into the court equity fund[.]
16. Preliminarily and permanently enjoin Defendants, their successors, and their agents from transferring to the treasury at the time of termination of the Tier 1 Plan those funds remaining in the various accounts in the Tier 1 Plan in excess of those needed to pay retirement allowances to members, vested former members, retirants and retirement allowance beneficiaries of the Tier 1 Plan and order Defendants and their successors to pay such funds to those persons who at time of termination are members, vested former members, retirants, or retirement allowance beneficiaries!.]

.
17. Award Plaintiffs and members of The Class attorneys fees pursuant to 42 USC § 1988[.]
18. Award Plaintiffs and members of The Class interest to which they are entitled; and
19. Award Plaintiffs and members of The Class such additional or different relief to which they are entitled.

.
3. Preliminarily and permanently enjoin Defendants from requiring those Plaintiffs and members of The Class who have remained as participants in the Tier 1 Plan to contribute a higher percentage of their compensation for a retirement allowance than judges of the 36th District Court.

. Unlike the majority, I do not read Dubuc, Brotherton, and Irvine as basically rendering other factors irrelevant when evidence is presented regarding whether the state treasury would be liable for a judgment.

. I disagree with this conclusion as well, because it is contrary to the statutes establishing the JRS, which require the State Treasurer to invest JRS assets like all other assets of the State. Mich. Comp. Laws § 38.2206(1), 38.1132-38.H40i. The Act requires the State Treasurer to deposit JRS funds in the same manner as and subject to the laws governing the deposit of other State funds. Id. § 38.2206(1).
Other courts have held that funds deposited in a retirement system do not lose their fundamental character as public funds. See Fitzpatrick v. Bitzer, 519 F.2d 559, 565 n. 4 (2d Cir.1975), aff'd in part, rev’d in part on other grounds, 427 U.S. 445, 96 S.Ct 2666, 49 L.Ed.2d 614 (1976). Relatedly, courts have held that retirement systems are arms of the state and therefore entitled to Eleventh Amendment immunity. See, e.g., McGinty v. New York, 251 F.3d 84 (2d Cir.2001) (holding that the New York Retirement System is an arm of the state; dismissing the plaintiffs claims as barred by the Eleventh Amendment); JMB Group Trust IV v. Pennsylvania Mun. Ret. Sys., 986 F.Supp. 534, 538 (N.D.Ill.1997) (holding that the Pennsylvania Retirement System was an arm of the state where the duties and responsibilities of the Retirement System were "totally defined and limited by the Commonwealth of Pennsylvania under the provisions of the Pennsylvania Code”); Sculthorpe v. Virginia Ret. Sys., 952 F.Supp. 307 (E.D.Va.1997) (holding that Virginia's Retirement System is an arm of the state entitled to Eleventh Amendment immunity); Mello v. Woodhouse, 755 F.Supp. 923 (D.Nev.1991) (holding that suit against the Nevada Public Employees' Retirement Board was barred by the Eleventh Amendment).
Blake v. Kline, 612 F.2d 718 (3d Cir.1979), cited by the majority, is not particularly persuasive. Although the Third Circuit directed the district court to consider on remand an opinion by the Pennsylvania Attorney General stating that the money deposited in the retirement fund had lost its identity as Commonwealth funds, the Court ultimately stated that the district court needed to determine whether the state, in making a contribution, was acting in the role of sovereign or some other capacity. Id. at 724.
*399 Other factors, see Hall v. Med. College of Ohio, 742 F.2d 299, 302 (6th Cir.1984), reflect that the JRS is an arm of the state. The Michigan Judges Retirement System and the Michigan Judges Retirement Board were created by the Michigan Judges Retirement Act. of 1992, Mich. Comp. Laws §§ 38.2101-2670. The Act mandate that the Board consist of the State Treasurer and the Attorney General of Michigan, as well as one sitting judge and two additional members appointed by Governor of Michigan with the advice and consent of the Michigan Senate. Mich. Comp. Laws § 38.2202(1). The Act is integrated with other Michigan departments. Indeed, the Michigan Judges Retirement Board "is created in the department [of management and budget].” §§ 38.2202(1); 38.2104(5). The Michigan Department of Management is responsible "for the budgeting, procurement, and related management functions of the retirement system.” Id. § 38.2206(1). The State Treasurer "is the treasurer of the retirement system.” Id. § 38.2206(Z). The Michigan Attorney General is the Board's legal advisor and represents the Board in all litigation. Id. § 38.2207. The retirement system is required to prepare an annual report each fiscal year "regarding the financial, actuarial, and other activities of the retirement system,” and present it to the Governor and Legislature. Id. § 38.2209. Furthermore, "[t]he retirement system shall draw its warrants upon the state treasury, payable out of funds of the retirement system, for the payment of retirement allowances, accumulated contributions, and the payment of salaries and other expenses necessary in the administration of the retirement system.” Id. § 38.2208. The retirement system, is funded, in part, by annual legislative appropriations and other public monies. Id. 38.2303, 38.2304.

. In Dubuc, the individual defendants, all of whom were sued in their official capacities, argued that they were immune from the federal claims under 42 U.S.C. § 1983 because state law made them "absolutely immune from suit for conduct arising out of the performance of their duties.” Dubuc, 342 F.3d at 617. This Court rejected this argument because state law cannot insulate the defendants from violations of federal law. It is for this proposition that I cited Dubuc, and no other. Thus, the doctrine of Ex Parte Young was therefore applicable to the individual defendants sued in their official capacities.

. This leads to a curious result: although the state cannot be sued in state court because it has exercised its sovereign immunity, it can be sued in federal court because it cannot be sued in state court.

7. E.g., North Carolina v. Temple, 134 U.S. 22, 30, 10 S.Ct. 509, 511, 33 L.Ed. 849 (1890); Fitts v. McGhee, 172 U.S. 516, 524, 19 S.Ct. 269, 272, 43 L.Ed. 535 (1899); Bell v. Mississippi, 177 U.S. 693, 20 S.Ct. 1031, 44 L.Ed. 945 (1900); Smith v. Reeves, 178 U.S. 436, 446, 20 S.Ct. 919, 923, 44 L.Ed. 1140 (1900); Palmer v. Ohio, 248 U.S. 32, 34, 39 S.Ct. 16, 16-17, 63 L.Ed. 108 (1918); Duhne v. New Jersey, 251 U.S. 311, 313, 40 S.Ct. 154, 64 L.Ed. 280 (1920); Ex parte New York, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921); Missouri v. Fiske, 290 U.S. 18, 26, 54 S.Ct. 18, 20-21, 78 L.Ed. 145 (1933); Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 51, 64 S.Ct. 873, 875, 88 L.Ed. 1121 (1944); Ford Motor Co. v. Department of Treasury of Ind., 323 U.S. 459, 464, 65 S.Ct. 347, 350-51, 89 L.Ed. 389 (1945); Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 304, n. 13, 72 S.Ct. 321, 324, n. 13, 96 L.Ed. 335 (1952); Parden v. Terminal Railway of Ala. Doclcs Dept., 377 U.S. 184, 186, 84 S.Ct. 1207, 1209-1210, 12 L.Ed.2d 233 (1964); United States v. Mississippi, 380 U.S. 128, 140, 85 S.Ct. 808, 814-15, 13 L.Ed.2d 717 (1965); Employees of Dept. of Public Health and Welfare of Mo., 411 U.S. 279, 280, 93 S.Ct. 1614, 1615-1616, 36 L.Ed.2d 251 (1973); Edelman v. Jordan, 415 U.S. 651, 662-663, 94 S.Ct. 1347, 1355-1356, 39 L.Ed.2d 662 (1974); Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); Cory v. White, 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 97-100, 104 S.Ct. 900, 906-908, 79 L.Ed.2d 67 (1984); Atascadero State Hospital v. Scanlon, 473 U.S. 234, 237-238, 105 S.Ct. 3142, 3144, 3145, 87 L. E.2d 171 (1985); Welch v. Texas Dept. of Highways and Public Transp., 483 U.S. 468, 472-474, 107 S.Ct. 2941, 2945-2946, 97 L.Ed.2d 389 (1987) (plurality opinion); Dellmuth v. Muth, 491 U.S. 223, 227-229, and n. 2, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 *402 (1990); Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991); Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 144, 113 S.Ct 684, 687-688, 121 L.Ed.2d 605 (1993).

. This is equally true as to all of Plaintiffs' claims.

. In Hughes v. Judges’ Ret. Bd., 407 Mich. 75, 282 N.W.2d 160 (1979), a group of already-retired judges challenged legislation amending the Judges Retirement Act to increase the pension benefits to judges who retired after its effected date. The amendment caused the pension of new and still-active judges to be higher than retirees' benefits. The Michigan Supreme Court analyzed the statute under the rational-basis test and concluded that statute was constitutional. Ir reasoned that the legislation was rational because the Legislature was inducing “competent and qualified attorneys to become judges, or to remain judges if already in office.” Id. at 168.