# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 6, 2008           Decided July 29, 2008

No. 07-5024

MARILYN VANN, ET AL.,
APPELLEES

v.

DIRK KEMPTHORNE, SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

CHEROKEE NATION,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01711)

———

*Garret G. Rasmussen* argued the cause for appellant. With him on the briefs were *Raymond G. Mullady Jr.*, *Lanny J. Davis*, and *Adam W. Goldberg*. *Christopher M. O'Connell* entered an appearance.

*Jonathan Velie* argued the cause for appellees. With him on the brief were *Jack McKay*, *Alvin B. Dunn*, *Thomas G. Allen*, and *Ellen C. Cohen*.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The issue on appeal is the extent to which sovereign immunity protects a federally recognized Indian tribe and its officers against suit. For the reasons that follow, we hold that the suit may proceed against the tribe's officers but not against the tribe itself.

## I.

The Cherokee Nation shares with the United States a common stain on its history: the Cherokees owned African slaves. At the end of the Civil War, during which the tribe sided with the Confederacy, the Cherokee Nation and the United States entered into a treaty reestablishing relations. *See* Treaty with the Cherokee, July 19, 1866, 14 Stat. 799 ("1866 Treaty"). In the treaty, the Cherokee Nation renounced slavery and involuntary servitude, and promised to extend "all the rights of native Cherokees" to the former Cherokee slaves, who came to be known as "Freedmen." 1866 Treaty, art. IX.

In 1896, Congress directed the Dawes Commission to create membership rolls for the so-called Five Civilized Tribes of Oklahoma, which included the Cherokee Nation. *See* Act of June 10, 1896, ch. 398, 29 Stat. 321, 339. The rolls for the Cherokees were completed in 1907 and resulted in two lists: a "Blood Roll" for native Cherokees, and a "Freedmen Roll" for former slaves and their descendants. These lists serve an important function because the tribal constitution of 1976 provides that citizenship in the Cherokee Nation must be proven by reference to the Dawes Commission Rolls. The citizens of the Cherokee Nation choose their tribal leaders by popular election according to procedures approved by the

Secretary of the U.S. Department of the Interior ("Secretary"). *See* Principal Chiefs Act of 1970, Pub. L. 91-495; *see also* Letter from Neal A. McCaleb, Assistant Sec'y of Indian Affairs, U.S. Dep't of Interior, to Chadwick Smith, Principal Chief, Cherokee Nation (Mar. 15, 2002) (reaffirming continuing validity of the Principal Chiefs Act), J.A. 150–51; Letter from Neal A. McCaleb, Assistant Sec'y of Indian Affairs, U.S. Dep't of Interior, to Chadwick Smith, Principal Chief, Cherokee Nation (Apr. 23, 2002) (disavowing letter of March 15, 2002, but reaffirming continuing validity of the Principal Chiefs Act), J.A. 153–54.

Marilyn Vann and other descendants of persons listed on the Freedmen Roll (collectively, "the Freedmen") allege they were not permitted to vote in two tribal elections because they lack an ancestral link to the Blood Roll. In the May 24, 2003 election, voters reelected Chief Chadwick Smith, chose other tribal officers, and amended the tribal constitution to eliminate a provision requiring the Secretary's approval of amendments. The July 26, 2003 election saw further constitutional amendments and a run-off for tribal officers. The Freedmen, protesting their alleged disenfranchisement, asked the Secretary to invalidate the May 24 election. The Secretary pressed the Cherokee Nation to address the Freedmen's concerns and submit its election procedures for federal review. *See, e.g.*, Letter from Jeanette Hanna, Regional Director, U.S. Dep't of Interior, to Chadwick Smith, Principal Chief, Cherokee Nation (July 25, 2003) ("The [Principal Chiefs Act] provides . . . that the procedures for selecting the Principal Chief of the Cherokee Nation are subject to approval by the Secretary of the Interior. We are aware of no evidence that the Secretary has approved the current procedures for the election of the Principal Chief."), J.A. 194. Except for writing a few letters, the Cherokee Nation appears to have done little in response. The Secretary

nevertheless recognized Chief Smith's election on August 6, 2003, referring any election disputes to the tribal courts. *See* Letter from Jeanette Hanna, Regional Director, U.S. Dep't of Interior, to Chadwick Smith, Principal Chief, Cherokee Nation (Aug. 6, 2003) (stating that "it is inappropriate and premature for the Department to question the validity of the election of Tribal officials"), J.A. 199–200. The Secretary held the May 24 constitutional amendment under review until Chief Smith eventually withdrew the tribe's request for approval of that amendment in June 2006.

The Freedmen sued the Secretary under the Administrative Procedure Act in the United States District Court for the District of Columbia, alleging that their exclusion from the tribal elections, along with the Secretary's recognition of those elections, violated the Thirteenth Amendment, the Fifteenth Amendment, the Cherokee constitution, the 1866 Treaty, the Principal Chiefs Act, and the Indian Civil Rights Act. The Freedmen sought a declaratory judgment that the Secretary had behaved arbitrarily and capriciously. 5 U.S.C. § 706(2)(A). The Freedmen also sought to enjoin the Secretary from recognizing the results of the 2003 elections, or of any future elections from which the Freedmen would be excluded.

The district court granted the Cherokee Nation leave to intervene for the limited purpose of challenging the suit under Federal Rule of Civil Procedure 19. The Cherokee Nation then moved to dismiss on the grounds that although it was a necessary and indispensable party, sovereign immunity barred its joinder.[1] *See* FED. R. CIV. P. 19(b) ("If a person who is

---

[1] The words "necessary" and "indispensable" have become obsolete in the Rule 19 context as a result of stylistic changes to the Rule that have occurred since the proceedings in the district court. *See*

required to be joined if feasible [as defined in subparagraph (a)] cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."). The Freedmen responded with a motion for leave to file an amended complaint naming as defendants the Cherokee Nation, Chief Smith, and other tribal officers, all of whom were alleged to have violated the Thirteenth Amendment and the 1866 Treaty. After determining that the tribe was a necessary party under Rule 19(a), the district court concluded that the tribe and its officers could be joined because the tribe did not enjoy sovereign immunity against the Freedmen's suit. Accordingly, the district court denied the motion to dismiss and granted the motion for leave to file.

The Cherokee Nation appeals the denial of its motion to dismiss on sovereign immunity grounds. Under 28 U.S.C. § 1291 and the collateral order doctrine, we may hear an interlocutory appeal from the denial of such a motion. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993), and *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 928 (7th Cir. 2008) ("A district court's determination that a tribe's sovereign immunity has been waived by the tribe or abrogated by Congress falls within the ambit of the collateral order doctrine . . . ."). We review de novo the district court's conclusion that the Cherokee Nation and its officers do not enjoy tribal sovereign immunity. *See Cherokee Nation v. Babbitt*, 117 F.3d 1489, 1497–98 (D.C. Cir. 1997).

---

*Republic of Philippines v. Pimentel*, No. 06-1204, slip op. at 2 (U.S. June 12, 2008) (noting the replacement in Rule 19 of "necessary" with "required," and the deletion of "indispensable").

6

## II.

Indian tribes did not relinquish their status as sovereigns with the creation and expansion of the republic on the North American continent. The courts of the United States have long recognized that the tribes once were, and remain still, independent political societies. *E.g.*, *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 556–57 (1832); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16–17 (1831). "Perhaps the most basic principle of all Indian law, supported by a host of decisions, is that those powers lawfully vested in an Indian nation are not, in general, delegated powers granted by express acts of Congress, but rather 'inherent powers of a limited sovereignty which has never been extinguished.' " FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.01[1][a], at 206 (Nell Jessup Newton ed., 2005) [hereinafter, COHEN'S HANDBOOK] (quoting *United States v. Wheeler*, 435 U.S. 313, 322–23 (1978)). That said, Congress may whittle away tribal sovereignty as it sees fit. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) (noting that "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess"); *Wheeler*, 435 U.S. at 322 (noting that tribes are "subject to ultimate federal control"); *Fisher v. District Court*, 424 U.S. 382, 390 (1976) (referring to tribes' "quasi-sovereign status"); *United States v. Kagama*, 118 U.S. 375, 381 (1886) (referring to tribes as "semi-independent"); *Cherokee Nation*, 30 U.S. (5 Pet.) at 17 (referring to tribes as "domestic dependent nations" whose "relation to the United States resembles that of a ward to his guardian").

As sovereigns, Indian tribes enjoy immunity against suits. *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*,

498 U.S. 505, 509 (1991); *Santa Clara Pueblo*, 436 U.S. at 58–59; *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 172 (1977); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940); *Wichita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 771 (D.C. Cir. 1986). This immunity flows from a tribe's sovereign status in much the same way as it does for the States[2] and for the federal government. *See Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996) (noting the "presupposition . . . that ' "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent" ' ") (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890) (quoting THE FEDERALIST No. 81 (Alexander Hamilton) (Clinton Rossiter ed., 1961))). Congress's power to limit the scope of a tribe's sovereignty extends to tribal sovereign immunity. "This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress." *Santa Clara Pueblo*, 436 U.S. at 58; *see also Okla. Tax Comm'n*, 498 U.S. at 510 ("Congress has always been at liberty to dispense with such tribal immunity or to limit it."). But abrogation of tribal sovereign immunity requires an explicit and unequivocal statement to that effect. *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 418 (2001) ("To abrogate tribal immunity, Congress must 'unequivocally' express that purpose.") (quoting *Santa Clara Pueblo*, 436 U.S. at 58); *Cherokee Nation*, 117 F.3d at 1498 ("Any waiver of a tribe's sovereign immunity, whether by Congress or by the tribe itself, 'cannot be implied but must be unequivocally expressed.' ") (quoting *Santa Clara Pueblo*, 436 U.S. at 58).

Has there been an abrogation of tribal sovereign immunity in our case? The district court concluded that

---

[2] The States also count the Eleventh Amendment as a source of sovereign immunity. *See* U.S. CONST. amend. XI.

"Congress clearly indicated its intent to abrogate the Cherokee Nation's immunity with respect to violations of the Thirteenth Amendment as evidenced by the Treaty of 1866." *Vann v. Kempthorne*, 467 F. Supp. 2d 56, 70 (D.D.C. 2006). The district court reasoned as follows. *See id.* at 66–70. The Thirteenth Amendment, which applies to Indian tribes, eradicates the badges and incidents of slavery. The 1866 Treaty implements similar principles for the Cherokee Nation. *See* 1866 Treaty, art. IX (abolishing slavery and granting Freedmen "all the rights of native Cherokees"); *id.* art. VI (declaring that the Cherokee Nation's laws "shall be uniform throughout said nation"); *id.* art. XII (acknowledging supremacy of federal law). Later historical developments, including an 1888 statute forcing the Cherokee Nation to share its assets with the Freedmen, further demonstrate Congress's intent to protect the Freedmen against discrimination. "By repeatedly imposing such limitations on the sovereignty of the Cherokee Nation in order to protect the Freedmen, Congress has unequivocally indicated its intent to abrogate the tribe's immunity with regard to racial oppression prohibited by the Thirteenth Amendment." *Vann*, 467 F. Supp. 2d at 69. Denying the Freedmen the right to vote in tribal elections violates the Thirteenth Amendment and the 1866 Treaty, so the Cherokee Nation cannot claim tribal sovereign immunity against a suit complaining of such a badge and incident of slavery.

The district court is mistaken to treat every imposition upon tribal sovereignty as an abrogation of tribal sovereign immunity.[3] Sovereignty and immunity are related, *Alden v.*

---

[3] The Freedmen make a similar error in arguing that the "overriding interest" of the United States implicitly abrogates tribal sovereign immunity. Freedmen's Br. at 9–15 (citing *Wheeler*, 435 U.S. at 323; *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209–10 (1978); *Washington v. Confederated Tribes of the Colville Indian*

*Maine*, 527 U.S. 706, 715 (1999), the latter being an attribute of the former, *P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 146. But it is possible to cut back sovereignty in a way that leaves sovereign immunity intact. *Cf. Kiowa Tribe*, 523 U.S. at 755 ("To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. . . . There is a difference between the right to demand compliance with state laws and the means available to enforce them."). Congress can impose substantive constraints upon a tribe without subjecting the tribe to suit in federal court to enforce those constraints, as the Supreme Court made clear in *Santa Clara Pueblo*. In that case, an individual Indian sued her tribe in federal court, alleging gender discrimination in violation of the equal protection guarantee of the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1302. Despite the ICRA's imposition of substantive constraints upon the tribe, the Supreme Court held the suit barred by tribal sovereign immunity and sent the plaintiff to pursue her claim in tribal court. *See* 436 U.S. at 58–59; *see also Nero v. Cherokee Nation*, 892 F.2d 1457, 1461 (10th Cir. 1989) (noting the *Santa Clara Pueblo* distinction between a substantive constraint and an abrogation of sovereign immunity). Absent explicit and unequivocal language to the contrary, the imposition of substantive constraints upon a tribe's sovereignty cannot be interpreted as an abrogation of its sovereign immunity.

We must determine for ourselves whether anything in the Thirteenth Amendment or the 1866 Treaty worked an abrogation of the Cherokee Nation's sovereign immunity.

---

*Reservation*, 447 U.S. 134, 153 (1980)). The cases cited speak to implicit limitations on tribal sovereignty and have nothing to do with tribal sovereign immunity, which is not subject to implicit abrogation. *Santa Clara Pueblo*, 436 U.S. at 58.

Again, we will only acknowledge such an abrogation if the text is express and unequivocal. *See Santa Clara Pueblo*, 436 U.S. at 59 (holding the ICRA not to abrogate tribal sovereign immunity because "[n]othing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief"); *Fla. Paraplegic, Ass'n v. Miccosukee Tribe*, 166 F.3d 1126, 1131 (11th Cir. 1999) (holding the Americans with Disabilities Act not to abrogate tribal sovereign immunity and declaring, "Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act"); *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 357 (2d Cir. 2000) (holding the Copyright Act not to abrogate tribal sovereign immunity, where nothing on the statute's face could be so construed).[4]

We find no express and unequivocal abrogation of the Cherokee Nation's sovereign immunity in the texts upon

---

[4] For examples of statutes that satisfy the abrogation standard, see COHEN'S HANDBOOK, § 7.05[1][b] (citing, *inter alia*, the Indian Depredation Act, 26 Stat. 851 (1891) (conferring jurisdiction upon Court of Claims to adjudicate "All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation, in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for"); the ICRA's habeas corpus provision, 25 U.S.C. § 1303 ("The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."); and the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(7)(A)(ii) ("The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . .")).

which the Freedmen rely. Nothing in § 1 of the Thirteenth Amendment so much as hints at a federal court suit by a private party to enforce the prohibition against badges and incidents of slavery against Indian tribes. U.S. CONST. amend. XIII, § 1 ("Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."). Although § 2 of the Thirteenth Amendment gives Congress the power to generate express and unequivocal language abrogating tribal sovereign immunity to allow for such suits, that promise remains unfulfilled absent some further legislative enactment. *Id.* § 2 ("Congress shall have power to enforce this article by appropriate legislation."). The 1866 Treaty similarly lacks any clear abrogation of tribal sovereign immunity, as the Tenth Circuit correctly concluded in *Nero*, 892 F.2d at 1461. The Freedmen point to articles VI, IX, and XII of the 1866 Treaty, but these say nothing about federal court suits against the Cherokee Nation.

The Freedmen argue that our search for intent to abrogate is misguided because the Thirteenth Amendment and the 1866 Treaty predate the doctrine of tribal sovereign immunity, such that the drafters of those texts could not have foreseen the interpretive rule requiring express and unequivocal abrogation. Freedmen's Br. at 15–20. This argument misapprehends the nature of tribal sovereign immunity, which is not the product of any enactment but an inherent attribute of a tribe's sovereignty. Tribal sovereign immunity existed at the Founding, as surely as did tribal sovereignty, and our only concern is whether the Thirteenth Amendment or the 1866 Treaty later abrogated that immunity. The unequivocal-abrogation rule reflects the belief, as true in the nineteenth century as it is today, that lawmakers do not lightly discard

sovereign immunity. We see no reason to depart from the established interpretive rule based on the vintage of the texts.

Because nothing in the Thirteenth Amendment or the 1866 Treaty amounts to an express and unequivocal abrogation of tribal sovereign immunity, the Cherokee Nation cannot be joined in the Freedmen's federal court suit without the tribe's consent. We reverse the district court's determination to the contrary.

### III.

Having found the tribe's sovereign immunity intact, we must now assess whether tribal officers enjoy the same immunity from suit as does the tribe itself. We do not approach this question from scratch, for *Ex parte Young*, 209 U.S. 123 (1908), and related cases have come to apply to questions of tribal sovereign immunity. *See Santa Clara Pueblo*, 436 U.S. at 59 (citing *Ex parte Young*); *Bassett*, 204 F.3d at 358 (citing *Ex parte Young*); *Tenneco Oil Co. v. Sac & Fox Tribe of Indians*, 725 F.2d 572, 574 (10th Cir. 1984) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)); *cf.* Recent Case, 79 HARV. L. REV. 851, 852 (1966) (suggesting extension of *Ex parte Young* to tribal sovereign immunity context).

"The basic doctrine of *Ex parte Young* can be simply stated. A federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land." 17A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4232 (3d ed. 2007) [hereinafter WRIGHT & MILLER] (citations omitted). In *Ex parte Young*, a

private party was allowed to pursue an injunction in federal court against Minnesota's attorney general to prohibit his enforcement of a state statute alleged to violate the Fourteenth Amendment. This result rested upon the fiction that the suit went against the officer and not the State, thereby avoiding sovereign immunity's bar. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984) (noting the fiction); Kenneth Culp Davis, *Suing the Government by Falsely Pretending to Sue an Officer*, 29 U. CHI. L. REV. 435 (1962) (same). The officer, so the reasoning goes, cannot take refuge in the State's immunity if he contravenes federal law, and is "stripped of his official or representative character and . . . subjected in his person to the consequences of his individual conduct." *Ex parte Young*, 209 U.S. at 159–60. The Supreme Court recently confirmed the ease with which this stripping rationale can be applied. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (citation and quotation marks omitted).

Applying the principle of *Ex parte Young* in the matter before us, we think it clear that tribal sovereign immunity does not bar the suit against tribal officers. *Santa Clara Pueblo*, which relied on *Ex parte Young* to hold a tribal officer "not protected by the tribe's immunity from suit," dictates this result. *See* 436 U.S. at 59. The Freedmen allege that the Cherokee Nation's officers are in violation of the Thirteenth Amendment and the 1866 Treaty, and seek an injunction preventing Chief Smith "from holding further elections without a vote of all citizens, including the Freedmen." Pls.' Second Am. Compl. ¶ 74, J.A. 138. Faced with allegations of ongoing constitutional and treaty

violations, and a prospective request for injunctive relief, officers of the Cherokee Nation cannot seek shelter in the tribe's sovereign immunity.

In an attempt to avoid the straightforward application of *Ex parte Young*, the Cherokee Nation raises three arguments, which we consider in turn. Finding none of them persuasive, we conclude that sovereign immunity is no bar to the Freedmen's suit against the tribe's officers, and therefore affirm the district court's determination to the same effect.

**A.**

Invoking *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), the Cherokee Nation argues that tribal sovereign immunity bars the suit against its officers because the requested relief really runs against the tribe itself. This is reminiscent of the losing argument in *Ex parte Young*. *See* 209 U.S. at 142, 149 (rejecting state officer's "objection . . . that the suit is, in effect, one against the State of Minnesota"). The argument is no more persuasive a century later. Due to an unfortunate footnote in the *Larson* opinion, however, we must explain our reasoning at some length.

*Larson* involved a contract dispute between the federal War Assets Administration and a private party to whom it had sold surplus coal, the Domestic & Foreign Commerce Corporation. The War Assets Administration understood the contract of sale to require payment in advance of delivery of the coal. When the Corporation insisted instead on depositing the funds upon receipt, the War Assets Administration considered the contract breached and sold the coal to a third party. The Corporation sued in federal court for declaratory and injunctive relief to prevent the federal Administrator from

delivering the coal to the third party, claiming entitlement to the coal under the original contract of sale.

The Supreme Court considered whether the sovereign immunity of the United States barred the suit against a federal officer. The Court acknowledged *Ex parte Young*'s stripping rationale, albeit with no direct citation to that case.

> There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. . . . [W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. . . . His actions are *ultra vires* his authority and therefore may be made the object of specific relief. . . . A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional. . . . Here, too, the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign. . . . These two types have frequently been recognized by this Court as the only ones in which a restraint may be obtained against the conduct of Government officials.

*Larson*, 337 U.S. at 689–90 (citing *Phila. Co. v. Stimson*, 223 U.S. 605, 620 (1912) (citing *Ex parte Young*)); *see also id.* at 704 ("Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions."). The stripping rationale did not apply to the Administrator because the Corporation's breach-of-contract claim did not show him to have acted outside his authority.

*See id.* at 691–92. Accordingly, the Court held the suit barred by federal sovereign immunity, concluding that the suit was actually against the United States and not its officer. *Id.* at 687–88.

Given the obvious distinction between our own case and the one just described, the Cherokee Nation's reliance on *Larson* seems curious. Unlike the federal officer in *Larson*, who was only alleged to have breached a contract, the tribal officers in our case are said to have violated the Thirteenth Amendment and the 1866 Treaty. These allegations bring our case within the stripping rationale set forth in *Ex parte Young* and described in *Larson*, such that tribal sovereign immunity should not bar the Freedmen's suit against the officers of the Cherokee Nation.

Undeterred, the Cherokee Nation pins its hopes to footnote 11 of the *Larson* opinion, which provides:

> Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. *North Carolina v. Temple*, 134 U.S. 22 (1890).

*Larson*, 337 U.S. at 691 n.11. The Cherokee Nation claims that the Freedmen improperly seek "affirmative action" on the part of tribal officers. The Second Amended Complaint requests an injunction preventing Chief Smith "from holding further elections without a vote of all citizens, including the Freedmen." Pls.' Second Am. Compl. ¶ 74, J.A. 138.

According to the tribe, this injunction "would restrain the Nation from holding its elections and require the Nation to take action to amend its constitution and voting laws to include Plaintiffs as citizens with voting rights." Cherokee Nation's Br. at 50. At oral argument, counsel for the tribe said further, "what the relief would do is, it would paralyze the Nation, it would stop the Nation from having any elections, unless the Nation took affirmative steps to amend its constitution." Oral Arg. Recording at 8:27–8:37. Citing decisions of our sister circuits, *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997); *Shermoen v. United States*, 982 F.2d 1312, 1320 (9th Cir. 1992), the tribe tells us that "[t]he *Ex parte Young* fiction simply does not survive Plaintiffs' requested relief." Cherokee Nation's Br. at 50.

Whatever the *Larson* Court meant when it referred to "affirmative action," we conclude that this dicta does not limit the force of *Ex parte Young* in the case at hand. We begin with an examination of footnote 11, a Delphic pronouncement that has been the subject of great judicial and scholarly attention. *See, e.g.*, *Knight v. New York*, 443 F.2d 415, 420 (2d Cir. 1971) (Friendly, J.) ("The *Larson* footnote has become the subject of microscopic scholarly scrutiny."); David P. Currie, *Sovereign Immunity and Suits Against Government Officers*, 1984 SUP. CT. REV. 149, 158 ("There was a grain of truth in this wholly gratuitous dictum, but its principal effect was to sow confusion."); David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case*, 98 HARV. L. REV. 61, 74 n.80 (1984) (referring to "the *Larson* Court's troublesome footnote 11"); Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 MICH. L. REV. 867, 875 n.32 (1970) (noting the possible significance of the Supreme Court's failure to cite footnote 11 in *Malone v. Bowdoin*, 369 U.S. 643 (1962),

which otherwise relied heavily on *Larson*). We then consider whether the supposed prohibition against "affirmative action" in footnote 11 reaches the Freedmen's suit.

Before going any further, however, we note that the continuing force of *Larson*'s footnote 11 is not free from doubt. The Supreme Court did not mention the supposed prohibition against "affirmative action" in its recent treatment of the *Ex parte Young* doctrine in *Verizon*, 535 U.S. at 645–48, its discussion of tribal sovereign immunity in *Santa Clara Pueblo*, 436 U.S. at 58–59, or its decisions allowing affirmative injunctions against state officers under *Ex parte Young*, *e.g.*, *Milliken v. Bradley*, 433 U.S. 267 (1977). Ill-positioned as we are to issue retractions for the highest court in the land, we will assume *arguendo* that footnote 11 is not a dead letter circa 2008. But our discussion should not be mistaken for an endorsement of its continuing vitality, and any court that would rely on footnote 11 to bar an *Ex parte Young* suit would have to grapple with the issue of its possible obsolescence.

Taking a cue from Professor Jaffe, we begin by noting the Court's use of *may* — as in, "a suit *may* fail . . . if the relief requested . . . will require affirmative action by the sovereign," *Larson*, 337 U.S. at 691 n.11 (emphasis added) — rather than more commanding alternatives like *must* or *will* or *shall*. Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 HARV. L. REV. 1, 34 (1963) (noting that if "*may* is read as *may* and not as *must*, it is unobjectionable," but that a contrary reading would place footnote 11 at odds with "well-established doctrines"). Only by embracing this equivocation can we read footnote 11 in harmony with prior pronouncements. Consider the following statement from *Ex parte Young*: "There is no doubt that the court cannot control the exercise of the discretion of an

officer. It can only direct *affirmative action* where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action. In that case the court can direct the defendant to perform this merely ministerial duty." 209 U.S. at 158 (emphasis added) (citing *Bd. of Liquidation v. McComb*, 92 U.S. 531, 541 (1875)). This language suggests that "affirmative action" is not universally condemned in suits against officers, and that some "affirmative action" is permissible. Footnote 11 is not to the contrary, provided we read *may* to mean what it says.

What, then, of that type of "affirmative action" that *Larson* purports to forbid? Footnote 11 cites a single case, *North Carolina v. Temple*, 134 U.S. 22 (1890), which concerned a private bondholder's suit to compel a state auditor to levy a tax, the proceeds of which would be used to pay interest to holders of state bonds. In a half-page opinion, the Supreme Court dismissed the suit on sovereign immunity grounds. *Id.* at 30 ("We think it perfectly clear that the suit against the auditor in this case was virtually a suit against the State of North Carolina. In this regard it comes within the principle of the cases of [*Jumel*], [*Cunningham*], [*Hagood*], and [*In re Ayers*]."). *Temple*, in turn, cited four cases involving bondholders. *See Louisiana v. Jumel*, 107 U.S. 711, 720–23 (1883) (holding that sovereign immunity prevents mandamus action to compel state officers to levy a tax to pay bondholders); *Cunningham v. Macon & Brunswick R.R. Co.*, 109 U.S. 446, 450–57 (1883) (holding that sovereign immunity prevents bondholders' foreclosure suit); *Hagood v. Southern*, 117 U.S. 52, 65–71 (1886) (holding that sovereign immunity prevents suit to compel state comptroller general to levy a tax to fund redemption of revenue bond scrip); *In re Ayers*, 123 U.S. 443, 497–98, 502–03 (1887) (holding that sovereign immunity prevents suit to enjoin state officer from

bringing tax collection suits against persons who had paid taxes with bond coupons, where such collection was alleged to breach bondholder's contract, and where specific performance of acceptance of coupons was requested).

These cases, from whence came *Larson*'s prohibition against "affirmative action," reflect a familiar limitation on judicial power. A private party cannot by judicial decree force a state officer to levy a tax because to do so would "require, by affirmative official action on the part of the defendants, the performance of an obligation which belongs to the State in its political capacity." *Hagood*, 117 U.S. at 70. In compelling an officer to levy tax, the court would "assum[e] the control of the administration of the fiscal affairs of the State to the extent that may be necessary to accomplish the end in view." *Jumel*, 107 U.S. at 722. Such an attempt to control an officer would place the court on the wrong side of the line thought to divide "discretionary" from "ministerial" functions. *See Hagood*, 117 U.S. at 69 (" '[A] court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter.' ") (quoting *Bd. of Liquidation*, 92 U.S. at 542).

*Hawaii v. Gordon*, 373 U.S. 57 (1963) (per curiam), a case upon which counsel for the Cherokee Nation relied at oral argument, shows the principle at work. In *Gordon*, the federal Director of the Bureau of the Budget had advised federal agencies that the United States was not obliged by the Hawaii Statehood Act to convey certain federal land to that State. Hawaii sued the Director, "seeking to obtain an order requiring him to withdraw this advice to the federal agencies, determine whether a certain 203 acres of land in Hawaii . . . was land or properties 'needed by the United States' and, if not needed, to convey this land to Hawaii." *Id.* at 58 (quoting the statute). The Supreme Court dismissed the suit on

sovereign immunity grounds. *Id.* In addition to condemning the impropriety of using judicial processes to wrest land from the United States, the Court also noted with disapproval that "the order requested would require the Director's official affirmative action." *Id.* This disposition echoed the Solicitor General's argument that Hawaii was requesting prohibited "affirmative action" because the Director, acting in his personal capacity, lacked the authority to cancel an official report concerning sovereign property and issue a new one. *See* Brief in Opposition to Motion for Leave to File Complaint 20–23, 1962 WL 107667 (June 18, 1962) (citing, *inter alia*, *Larson*'s footnote 11).

Whatever the precise meaning of "affirmative action," we think it clear that the Freedmen's suit against the Cherokee Nation does not run afoul of the prohibition as used in footnote 11. The Second Amended Complaint contains a single request for relief against an officer: an injunction preventing Chief Smith "from holding further elections without a vote of all citizens, including the Freedmen." Pls.' Second Am. Compl. ¶ 74, J.A. 138. This relief, if granted, would not oblige the tribe's officer to use his discretionary authority to comply with the injunction. To the contrary, it would prevent the officer from exercising any such authority in violation of the Thirteenth Amendment or the 1866 Treaty. The Cherokee Nation complains that the requested relief will require amendments to the tribe's constitution and voting laws, but the Freedmen do not call for any such changes on the part of the tribe's officers in their Second Amended Complaint. That the tribe might ultimately amend its constitution to bring its elections into conformance with federal law is irrelevant to our sovereign immunity analysis, because any such change would not be the direct result of judicial compulsion. If the tribe pursues these changes, its discretion will not be steered by the judicial hand. The

Freedmen's suit falls squarely within the principle of *Ex parte Young*. *See* 209 U.S. at 159 ("The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer.").

At bottom, the Cherokee Nation's reliance on footnote 11 and similar pronouncements reflects wishful thinking.[5] The tribe imagines a world where *Ex parte Young* suits cannot proceed if they will have any effect on a sovereign. But that is what *Ex parte Young* suits have always done. *See, e.g.*, *Milliken*, 433 U.S. at 288–90 (relying on *Ex parte Young* in suit to desegregate public schools); *Griffin v. County Sch. Bd.*, 377 U.S. 218, 228 (1964) (same); *Orleans Parish Sch. Bd. v.*

---

[5] The tribe quotes two cases with similar language. *See Gordon*, 373 U.S. at 58 ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. Here the order requested would require the [federal officer's] official affirmative action, affect the public administration of government agencies and cause as well the disposition of property admittedly belonging to the United States. The complaint is therefore dismissed.") (citations omitted); *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 n.11 ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'") (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (internal quotation marks omitted)).

*Bush*, 242 F.2d 156, 160–61 (5th Cir. 1957) (same); *Sch. Bd. v. Allen*, 240 F.2d 59, 62–63 (4th Cir. 1956) (same). To credit the tribe's position would be to conclude that *Larson* overruled *Ex parte Young* in dicta, in a footnote, without even citing the case. We doubt whether a case of such monumental importance could have come to rest in such a shallow grave. *See* 17A WRIGHT & MILLER, *supra*, § 4231 ("Indeed it is not extravagant to argue that Ex parte Young is one of the three most important decisions the Supreme Court of the United States has ever handed down."). The Supreme Court mentioned no such change when it recently "confirmed that the core of the Young doctrine is still alive and well." RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1028 (5th ed. 2003) (citing *Verizon*, 535 U.S. 635). We therefore reject the Cherokee Nation's argument.

**B.**

The Cherokee Nation's next attempt to fend off *Ex parte Young* relies on *Seminole Tribe v. Florida*, 517 U.S. at 73–76. In that case, a tribe sued a State and its officers under a provision of the Indian Gaming Regulatory Act ("IGRA") purporting to abrogate state sovereign immunity. After concluding that Congress lacked power under Article I so to abrogate, *id.* at 57–73, the *Seminole Tribe* Court considered the tribe's contention that the suit could proceed against state officers under *Ex parte Young*. The Court rejected this argument because the IGRA provided for a remedial scheme against the States that was more limited in scope than would have been a suit under *Ex parte Young*. *See Seminole Tribe*, 517 U.S. at 74 ("[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting

aside those limitations and permitting an action against a state officer based upon *Ex parte Young*.").

This *Seminole Tribe* exception applies if we can discern an intent to displace *Ex parte Young* suits through the establishment of a more limited remedial regime. *See Verizon*, 535 U.S. at 647–48. The Cherokee Nation argues that article VII of the 1866 Treaty provides such a remedial scheme against the tribe, thereby foreclosing suits against the tribe's officers. But the treaty provision in question, which opens the federal courts to suits between "inhabitant[s]" of two different districts within the tribe's territory, does not by its terms provide for any type of suit against the tribe itself. As the Cherokee Nation itself argues elsewhere in its briefs, the tribe is not an "inhabitant" of its own territory. Cherokee Nation's Br. at 26. The 1866 Treaty does not provide for *any* remedial scheme against the Cherokee Nation, much less a "detailed remedial scheme," so the *Seminole Tribe* argument fails.

## C.

Finally, the Cherokee Nation argues that the Freedmen cannot pursue their claims under *Ex parte Young* because the requested relief "implicates special sovereignty interests." *Idaho v. Couer d'Alene Tribe*, 521 U.S. 261, 281 (1997). In *Couer d'Alene*, the Supreme Court held that *Ex parte Young* did not allow a tribe to sue state officers for infringing upon tribal property rights in violation of federal law, reasoning that control of submerged lands was a core sovereign interest of the State. The Cherokee Nation contends that its special interests in controlling internal governance and defining tribal membership call for a similar result. We reject this argument.

The Cherokee Nation has no interest in protecting a sovereignty concern that has been taken away by the United

States. As the district court went to great lengths to explain, *Vann*, 467 F. Supp. 2d at 66–70, the Thirteenth Amendment and the 1866 Treaty whittled away the tribe's sovereignty with regard to slavery and left it powerless to discriminate against the Freedmen on the basis of their status as former slaves. The tribe does not just lack a "special sovereignty interest" in discriminatory elections — it lacks *any* sovereign interest in such behavior.

In addition, we cannot extend *Couer d'Alene* beyond its "particular and special circumstances," 521 U.S. at 287, which involved the protection of a State's land. In this regard, *Couer d'Alene* closely aligns with earlier decisions holding that *Ex parte Young* cannot be used to gain access to the State's treasury. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.") (citing *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945)). Compared to the interests at stake in *Couer d'Alene*, whose historical pedigree is carefully set forth in that opinion, 521 U.S. at 283–87 (citing, *inter alia*, Magna Carta and the Institutes of Justinian), the Cherokee Nation's relatively newfangled interest in controlling its tribal elections strikes us as less compelling. We leave it for the Supreme Court to decide whether to add additional sovereign interests to the core concerns discussed in *Couer d'Alene*.

## IV.

The district court determined that the Cherokee Nation was a required party under Federal Rule of Civil Procedure

19(a).[6] Having concluded that the district court erred in holding that the Cherokee Nation was amenable to suit, we reverse the judgment in part. On remand, the district court must determine whether "in equity and good conscience" the suit can proceed with the Cherokee Nation's officers but without the Cherokee Nation itself. *See* FED. R. CIV. P. 19(b).

*So ordered.*

---

[6] We do not review the district court's Rule 19(a) determination because the parties have not raised the issue on appeal.